T.C. Memo. 1999-83



UNITED STATES TAX COURT



COURTNEY LUNDQUIST AND BRENDA LUNDQUIST, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 20779-94.                    Filed March 19, 1999.



<u>Edward DeFranceschi</u>, for petitioners.

<u>Paul Colleran</u> and <u>David N. Brodsky</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' 1988, 1989, and 1990 Federal income tax as follows:


| Year | Deficiency |
|------|------------|
| 1988 | $26,658 |
| 1989 | 23,869 |
| 1990 | 14,305 |

The sole issue for decision is whether petitioner operated her horse breeding activity for profit in 1988, 1989, and 1990. We hold that she did not.

References to petitioner are to Brenda Lundquist. Section references are to the Internal Revenue Code.

## I. FINDINGS OF FACT

A. Petitioners

Petitioners are married and lived in Lake Worth, Florida, when they filed their petition. They have no children.

Petitioner Courtney Lundquist (Mr. Lundquist) owned Winnipesocki Airlines, a commuter airline, until he sold it in 1979. He later became a pilot for Delta Airlines. He retired from Delta in 1989.

Petitioner graduated from high school in 1959. She graduated from Bay State Junior College with an associate's degree in business in 1961. She worked as a flight attendant for Northeast Airlines for 2 years. She then worked for Avis Rent-a-Car, first as a rental agent and later as Avis' director of training at Logan Airport.

In 1966, petitioner began working for Kelly Services, Inc. (Kelly), as a branch manager. She became an area sales manager and helped Kelly obtain contracts including Ray-Chem and a regional Nielsen television survey. In 1976, petitioner began to work for Winnipesocki Airlines. She was president when her husband sold it in 1979.

Petitioner loves animals. From 1966 to 1984, petitioner bred English sheepdogs, Yorkshire terriers, and Maltese terriers. She sold 10 to 15 puppies. Petitioner did not report any income from this activity on her tax returns for tax years 1978 to 1984.

Petitioner is not a horse trainer and does not have any formal training in horse breeding. However, she has been interested in horses since she was 9 or 10 years old. She rode horses when she was a child.

B.   Dressage Competition

Dressage is an Olympic sport which involves training a horse to do basic movements that are executed in a small arena in front of a panel of judges. A dressage program is analogous to compulsory movements in figure skating. Three-day eventing is also an Olympic sport. It consists of a day each of dressage, cross country, and stadium jumping.

A dressage horse can start training when it is 3 years old. A horse can compete in medium level competitions when it is 6 or 7 and in upper level competitions when it is 8 or 9. Dressage levels are training, first, second, third, fourth, fifth, Prix St. Georges, Intermediare I, Intermediare II, and Grand Prix.

Dressage competitions award ribbons and prizes such as coats and coolers but do not offer monetary prizes. Traditional dressage horses are called "warmbloods", which are a mixture of European horse breeds and thoroughbreds. The main warmblood breeding centers were in Europe in 1982.

C.   Early Years of Petitioner's Horse Activity

In 1976, petitioner began her horse activity when she bought two young Anglo-Arab horses and began to learn about horse breeds.  She investigated dressage competitions, European horses, and breeding and concluded that warmblood horses from Europe are better for dressage than American thoroughbred horses.  Petitioners first reported on their tax return that petitioner's activity was a business in 1979.

Sometime during the early years of petitioner's horse activity (on a date not stated in the record), a horse threw her, causing her to have a concussion and temporary loss of sight.  She has not ridden since then.

Horst Planzor (Planzor) owned Westfalian Pride Farm in Poolesville, Maryland.  In 1980 or 1981, petitioner visited Planzor three times at his farm, where she saw his horses.  Planzor was a past president of the American Hanoverian Society.  Planzor owned a Hanoverian breeding stallion.

D.   Petitioner's Purchase of European Horses and First
     Competition

1.   Petitioner's First Trip to Europe To Buy Horses

Petitioner went to Germany in February 1982 with Michael Poulin (Poulin) and Ruth Sarkunas (Sarkunas).  Petitioner intended to buy two brood mares and a horse to perform in shows and compete.  Poulin was a dressage trainer from Maine and a member of the U.S. Olympic team.  Sarkunas was one of Poulin's students.  Sarkunas had trained with Nuno Olivera, who was well

known in the horse world. Petitioner reimbursed some of their expenses but did not otherwise pay them.

In Europe, petitioner saw Temptation, a breeding stallion approved by the Swedish Government which competed at the Prix St. Georges level of dressage in Germany from 1977 to 1981.

Petitioner bought Temptation and two brood mares, Abfahrt and Donka. Abfahrt was pregnant. Temptation cost about $30,000, and the two mares cost $1,500 to $3,500 each. Petitioner mortgaged some property to pay for the three horses.

Petitioner believed that if she bought a stallion she could use him to impregnate her own mares and mares owned by others.

Temptation and the two mares were required to be quarantined because they were more than 2 years old. Any horse more than 2 years old that can reproduce must be tested for equine ritritis. This test requires that a stallion be bred to two mares in Germany and wait 30 days to determine if he is infected with equine ritritis. After being quarantined in Europe, the horse must be quarantined in the United States. Abfahrt was unable to travel because she was pregnant and close to delivery, so petitioner placed her at a breeding facility in Europe where she delivered a foal. Abfahrt and her foal were then flown to the United States and quarantined. Petitioner did not know she would be required to quarantine the horses for more than 3 days.

Petitioner boarded Abfahrt, Donka, and the foal at Planzor's farm. Abfahrt's foal was bred to Planzor's stallion. The

resulting foal was named Markant.  Markant subsequently became seriously ill and had colic surgery.

2.  Temptation's Competition and Injury

Temptation came to the United States in June 1982 and was released from quarantine in July or August 1982.  Petitioner thought Temptation was from Switzerland when she bought him, but later learned that he was from Sweden.

Petitioner intended to campaign (i.e., show on the circuit) Temptation with Sarkunas as his rider.  Mary Phelps (Phelps), a prominent horse photographer, photographed Temptation with Sarkunas in the saddle shortly after Temptation was released from quarantine.  Poulin then began Temptation's dressage training at Poulin's farm in Maine.

Petitioner advertised that Temptation was available for stud in Dressage & Eventing magazine in September and October 1982 and in EquiSport magazine in January/February 1983.

Petitioner showed Temptation in the United States at Groton House Spring Show at Groton Farms in Hamilton, Massachusetts, in 1983.  When petitioner saw Temptation being unloaded from the van at that competition, she realized that he was lame.  Petitioner believed that Temptation was lame due to lack of care of his hooves.

Poulin entered Temptation at the third level of dressage. Two or three other horses were entered.  Temptation finished second and third in the tests.

Petitioner did not enter Temptation in any dressage competitions after the 1983 Groton House Spring Show because he was lame. Petitioner removed Temptation from Poulin's farm and boarded him at the Groton House Farm in Hamilton, Massachusetts, about 10 miles from her home. Petitioner agreed to give the owner of the farm breedings to Temptation in exchange for boarding.

### 3. Petitioner's Second Trip to Europe To Buy Horses

In 1983, petitioner returned to Sweden to buy mares to breed to Temptation. Petitioner bought Labrette, a 1-1/2-year-old filly. Petitioner was not required to quarantine Labrette because she was less than 2 years old, thereby avoiding the need to pay quarantine fees.

Petitioner also bought a 6-month old colt, Zenit, that she boarded for 4 years at the Swedish national stud facility. Zenit stayed at the Swedish national stud facility for 4 years so he could be raised like Temptation. After Zenit trained for 4 years, petitioner was asked if he could be trained to compete for the Swedish Olympic team. Petitioner declined and instead sold Zenit to Gunnar Ostergard, a Danish trainer and his wife, a Danish Olympic rider team member. Petitioner kept all breeding rights to Zenit.

## E. Petitioners' Move to Florida

### 1. The Lake Worth Residence

In January 1984, petitioners moved from New Hampshire to Florida. In 1984, petitioner owned Temptation, Labrette, and

Abfahrt, two colts, a Morgan horse, and a thoroughbred horse used by visitors to ride for pleasure.

Petitioner advertised that Temptation was available for stud in the Gold Coast Dressage Association program for May 5 and 6, 1984, and the programs for the 1984 and 1986 Palm Beach Dressage Derby. She joined the Miami Dade County Dressage Association and Gold Coast Dressage Association.

In April 1985, petitioners bought a facility for $240,000 for petitioner's horses in Lake Worth, Florida, next to the Palm Beach Polo and Country Club. This property had a four-bedroom house with 3,062 square feet, 5 acres of land with improved pastures with water, a five-stall barn with a tack room, three outdoor stalls with a roof, a lighted arena with a judging stand, a covered paddock and a run in a shed, and indoor and outdoor dog kennels.

Petitioner's parents moved with her to Florida in 1984. She used her money from the sale of a house that she owned in Massachusetts to buy them a two-bedroom home about 6 miles from petitioners' home.

Petitioner promoted Temptation in 1984 and 1985 by arranging for him to participate in parades and demonstrations. Serenity Reins and Temptation participated in the 1984 Palm Beach Dressage Derby and Stallion Parade. Petitioner arranged for Temptation to participate in demonstrations at the Gold Coast Dressage Association show at Trafalgar Park Equestrian Center, Miami, Florida, on May 5 and 6, 1984.

In 1985, petitioner investigated the use of artificial insemination to breed horses and had Temptation evaluated as a breeding stallion. Temptation's earning potential as a stud diminished considerably after he was injured. Temptation's stud fee was generally $500 if the owner did not want registration papers and $1,000 if the owner wanted registration papers. Petitioner bred Temptation two or three times for cash and once in exchange for boarding at the Groton House. On March 1, 1985, petitioner agreed to breed Temptation to a mare for $500.

In April 1985, petitioner wrote a letter to Ellen Dixon (Dixon), the daughter of F. Eugene Dixon, who was prominent in the horse world, in which she sought to lease her mares to Dixon. Petitioner believed that it would be prestigious to do so because petitioner's name and Serenity Farms would be listed above the stall of her mare. She believed this would be like having $1 million in publicity. In the letter she said:

> I am just looking to lease these mares out for one year so I can take a break. These last four years have been murder and my husband's patience is almost worn out with my not ever going away with him, not to mention spending all his money and never cooking, etc. I could never get back what I have into them monitarily [sic] and I really do love them two. I know your mare care would be super and I would not have to worry about them. I had originally hoped to lease them to someone to have Temptation babies but I know they would do Fruhwind proud.

Fruhwind died before petitioner and Dixon reached an agreement.

At a time not specified in the record, petitioner wrote notes to herself on the back of the letter to Ellen Dixon, including:

Open line of communication

(1) 5/10 breedings yearly - my own or outside mares ok (Good judgement re: when & where) not during training/s

(2) Referrals to breed Temptation

(3) Referrals to sell Mandarin & present & future babies

(4) Help Marija to properly show & sell filly & baby

(5) Promise of plenty of PR that Zenit was a product of Serenity Reins Farm type quality of purchase & breeding: Bought from us because we wished the best aux for the horse: Dual PR for future. * * * (illegible). Future working relationship

2. <u>Labrette</u>

Around 1985, petitioner bred Labrette, then 3, to Temptation. Labrette had a filly when she was 4. The filly was put down after she broke her neck in an accident when she was 6 months old.

3. <u>The White Fences Residence</u>

In 1986 and 1987, petitioners rented a residence at the White Fences Golf and Equestrian Club of the Palm Beaches (White Fences), Laxahatchee, Florida. White Fences is a planned community with a golf course and riding trails. The White Fences Dressage Derby was held at White Fences, and a dressage facility was being built there. The literature distributed by the owners of the White Fences development describes Serenity Reins as a top breeder of superb Swedish warmbloods. While petitioners lived at White Fences, they rented to others their residence in Lake Worth, Florida.

Jessica Raneshausen (Raneshausen) and her groom, Julia Hackensen (Hackensen), stayed for free at petitioners' house at White Fences while Hackensen was riding for another horse owner at a dressage derby. Raneshausen had been in the 1964 Olympics and is a member of the executive committee of the United States Dressage Federation. Hackensen is a Swedish Olympic rider.

4. Petitioners' Return to Lake Worth

In October 1987, petitioners moved back to Lake Worth. At that time, petitioner's herd consisted of Temptation, mares Labrette, Abfahrt, and Donka, four young horses, and one foal by Temptation. The quality of the two foals by Temptation was far below petitioner's expectations. She donated three of her horses (not specified in the record) to a Gainesville, Florida, breeding program and claimed a charitable contribution deduction of $1,050 for a mare.

F. Petitioner's Horse Activities During the Years in Issue (1988 to 1990)

Petitioners lived in Lake Worth in 1988 and 1989. Petitioner did not breed Labrette after 1987 because Labrette was very athletic, and petitioner thought Labrette would perform well on the show circuit. Petitioner entered Labrette in shows in the 1989-90 season.

1. Petitioner's Income From Serenity Reins

On April 10, 1989, petitioner agreed to breed Temptation to a mare for $750. In 1989, petitioner sold Donka for $1,500, Treasure for $7,900, and Pataplan for $4,300. She also received $200 for boarding a horse.

Petitioner sold Temptress for $4,000 on November 14, 1990, Mandarin for $6,500 on December 1, 1990, and another horse for $4,000 in 1990.

### 2. Raneshausen

Raneshausen used petitioner's facility and stayed for free at petitioners' home at Lake Worth during the 1989-90 show season. Petitioner did not have enough room to board Raneshausen's horses and found a rental stable for them. Raneshausen trained Labrette at no cost. Petitioner believed that it was very prestigious to have Raneshausen at petitioners' residence and that petitioner would be more likely to succeed in competitions and breeding of dressage horses if she associated with people who are prominent in the dressage horse field.

### 3. Darren Chiacchia

Darren Chiacchia (Chiacchia), a 3-day event rider, also stayed at petitioners' home at Lake Worth during the 1989-90 show season. In 1989, Chiacchia was 26 years old and had won many competitions. Chiacchia came to petitioners' home a month before the 1989-90 competitions began and discussed riding and competitions with petitioner. Chiacchia asked petitioner if he could ride Labrette.

Chiacchia and petitioner visited two Olympic trainers who had won gold medals, Joe Farges (Farges) and Conrad Holmfeld (Holmfeld). Farges and Holmfeld evaluated Labrette. Based on that evaluation, petitioner decided that Chiacchia would campaign Labrette with Raneshausen. They did so the entire season.

4. <u>1990</u>

Petitioner did not keep any horses at her residence at Lake Worth in 1990 and 1991 so she could care for her parents and take Labrette on the show circuit. In 1990, petitioner allowed a couple to live at her residence in exchange for their maintaining it.

a. <u>Temptation</u>

Petitioner boarded Temptation in Lexington, Kentucky, in 1990. Temptation unexpectedly died while there.

b. <u>Labrette</u>

During the 1990-91 season, Chiacchia successfully rode Labrette in combined training events (dressage, endurance, and jumping) in an effort to qualify Labrette for 3-day eventing in the Olympics to be held in Barcelona in 1992. Petitioner traveled on the competition with Chiacchia. Labrette began horse trials as a novice and rose to the level of preliminary in 1990. In 1990, Labrette finished second in the training level at the Mid-Florida competition. Labrette won the training level with a very high score at the Groton House in Massachusetts. Labrette also excelled in competitions at the Third Open Preliminary, the Open Preliminary at Ledyard Farm, the First Open Preliminary, and the Genessee Valley Hunt Horse Trial.

5. <u>Typical Daily Routine</u>

Petitioner usually worked 14 to 18 hours a day on her horse activity in 1988 and 1989. She fed and showered the horses, checked them for injuries, checked their shoes, drove the tractor

to drag manure, checked the fences, checked horse manure for sand, and cleaned the stalls.

Petitioner used a Corvette as the vehicle for her horse activity to haul hay, halters, and feed ropes. She drove it to all the competitions.

Petitioner never competed in any equestrian events. However, she attended those in which her horses competed.

### 6. Finances and Records

Petitioner did not have a separate checking account for her horse breeding activity in 1988, 1989, or 1990. Petitioner segregated from her personal records those which related to the horse activity and rent receipts and checks. She also had a credit card which she used only for her horse activity.

Petitioner summarized the checks for her horse activity in spreadsheets listing the check number, amount, date, payee, and general category of expense such as feed and hay, veterinarian, tack and supplies, dues and fees, labor, horse transportation, horse board, and office supplies. Petitioner gave her spreadsheets, check stubs, and credit card and cash receipts to her accountant during the years in issue.

### 7. Petitioner's Lack of Sales

Petitioner was surprised that buyers were not interested in the warmblood horses that she had for sale in the years in issue. She concluded that her potential customers were interested in color and marking but not pedigree.

G.    Petitioners' Income Tax Returns and Respondent's
      Determination

Petitioners reported the following on their joint tax
returns for tax years 1979 to 1990:

| Year | Wages | Interest, dividend, IRA, pension | Horse income | Expenses | Depreciation | Total expense | Net loss from horse activity |
|------|-------|-------|-------|-------|-------|-------|-------|
| 1979 | $78,260 | $658 | 0 | $1,952 | $284 | $2,236 | $2,236 |
| 1980 | 87,642 | 845 | 2,620 | 13,133 | 1,290 | 14,423 | 11,803 |
| 1981 | 95,049 | 7,553 | 4,871 | 24,878 | 3,468 | 28,346 | 23,475 |
| 1982 | 111,513 | 4,855 | 4,000 | 78,522 | 5,300 | 83,822 | 79,822 |
| 1983 | 136,807 | 2,275 | 7,107 | 61,660 | 6,628 | 68,288 | 61,181 |
| 1984 | 144,881 | 1,269 | 1,450 | 76,647 | 9,110 | 85,757 | 84,307 |
| 1985 | 162,519 | 1,072 | 7,133 | 64,589 | 18,883 | 83,472 | 76,339 |
| 1986 | 159,971 | 1,300 | 4,320 | 76,131 | 15,357 | 91,488 | 87,168 |
| 1987 | 178,850 | 1,802 | 1,937 | 46,432 | 11,419 | 57,851 | 55,914 |
| 1988 | 179,162 | 1,960 | 500 | 63,255 | 9,426 | 72,681 | 72,181 |
| 1989 | 74,775 | 150,002 | 12,400 | 75,458 | 7,161 | 82,619 | 70,219 |
| 1990 | 937 | 133,838 | 14,500 | 74,410 | 3,945 | 78,355 | 63,855 |
|  | 1,410,366 | 307,429 | 60,838 | 657,067 | 92,271 | 749,338 | 688,500 |

In the notice of deficiency, respondent disallowed losses
for 1988, 1989, and 1990 for petitioner's horse activity on the
grounds that petitioner did not conduct the activity for profit.[1]

_____

[1] Each party offered evidence of events involving petitioner
which occurred after the years in issue.  Each party objected to
the other's evidence from years after 1990, the last year in
issue.  We did not consider evidence of events which occurred
after 1990 because it did not show whether petitioner had a
profit objective during the years in issue.  See Estate of
Brockenbrough v. Commissioner, T.C. Memo. 1998-454; Gustafson's
Dairy, Inc. v. Commissioner, T.C. Memo. 1997-519; Choate Constr.
Co. v. Commissioner, T.C. Memo. 1997-495; cf. Estate of
Hutchinson v. Commissioner, T.C. Memo. 1984-55 (events after the
date in issue are relevant only if they shed light on the
taxpayer's state of mind on the date in issue), affd. 765 F.2d
665 (7th Cir. 1985).

## II.  OPINION

### A.    Background

The issue for decision is whether petitioner operated her horse breeding activity for profit in 1988, 1989, and 1990.

An activity is conducted for profit if it is conducted with an actual and honest profit objective.  Osteen v. Commissioner, 62 F.3d 356, 358 (11th Cir. 1995), affg. in part and revg. on other issues T.C. Memo. 1993-519; Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).  In deciding whether petitioner operated her horse racing and breeding activity for profit, we apply the nine factors listed in section 1.183-2(b), Income Tax Regs.  The factors are:  (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.  No single factor controls.  Osteen v. Commissioner, supra; Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); sec. 1.183-2(b), Income Tax Regs.  Petitioners have

the burden of proof on all issues in dispute in this case. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

B.   Application of the Factors

1.   Manner in Which the Taxpayer Conducted the Activity

Conducting an activity in a manner substantially like comparable businesses which are profitable may indicate that a taxpayer conducted the activity for profit.  Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979).

a.   Basic Investigation

Careful investigation of a potential business to ensure the best chance for profitability strongly indicates an objective to engage in the activity for profit.  Sec. 1.183-2(b)(2), Income Tax Regs.  Petitioner studied horse competitions and breeding before she began her activity.  However, she did not seriously investigate the activity's potential for profit.

b.   Business Plan

Petitioners contend that petitioner's notes on the back of her letter to Dixon show that petitioner had a business plan and showed her projected income and expenses.  We disagree.  The notes do not show petitioner's projected income and expenses or even that she was contemplating making a profit.  Those notes show primarily that she had an interest in horses, not necessarily an interest in business.

Petitioners' expert, Edward E. Emerson, Jr. (Emerson), had been in the horse training and breeding business for more than 25

years at the time of trial.  In 1997, he bred about 75 to 80 mares.  He had three stallions.  About 25 percent of his business was breeding, including about 10 percent of which was selling foals.  His gross receipts in 1997 were about $200,000, of which about 25 percent was from breeding.  The 5 to 10 breedings per year which petitioner wrote on the back of her letter to Dixon are considerably fewer than Emerson's 75 to 80.

Petitioner's letter to Dixon does not show that petitioner in 1985 had a bona fide objective that her horse activity would become profitable.

Petitioners contend that petitioner's business plan was to import dressage horses from Europe and breed and sell them in the United States.  Petitioner thought Temptation, Labrette, and the stallion Zenit could earn a profit because Planzor had told her that she could earn $15,000 per foal.  This was a dubious assumption for her to make because she bought brood mares in Europe for $1,500 to $3,500.

### c. Financial Records

Petitioner kept invoices, receipts, canceled checks (and a spreadsheet summarizing them), and bank statements, which she gave to the accountant to prepare petitioners' annual returns. However, petitioner did not have budgets, balance sheets, income projections, or other financial statements for her horse activity.  There is no evidence that she used her records to help her evaluate or improve the financial performance of her horse activity.

Petitioners contend that petitioner's books were like those kept by the taxpayer in Phillips v. Commissioner, T.C. Memo. 1997-128, whom we held conducted a horse activity for profit. We disagree. In Phillips, the taxpayers had a business plan. They calculated the costs per horse per month. They estimated when their horse activity would become profitable. They performed a detailed analysis of their horse activity and planned each of their horses' breedings. Petitioner did not do so. Phillips also differs from this case because the taxpayers in Phillips made significant changes in their operating methods by adding horse boarding, training, teaching classes, and operating a tack shop to sell equipment.

> ### d.   Commingling of Funds

Commingling of funds suggests that the activity is a hobby rather than a business for profit. See Rinehart v. Commissioner, T.C. Memo. 1998-205; Ballich v. Commissioner, T.C. Memo. 1978-497. Petitioner paid the expenses of the horse breeding activity from petitioners' personal account. She had no separate bank accounts for the horse breeding activity.

Petitioners used a credit card for her horse activity. However, she did not say that she paid all of the horse activity expenses with the credit card, and she paid the credit card bills from petitioners' personal checking account. She did not segregate income from her horse activity.

### e.    Change of Operating Methods

A willingness to adopt new techniques or abandon unprofitable methods may indicate that a taxpayer has a profit motive.  Sec. 1.183-2(b)(1), Income Tax Regs.

Petitioner changed her plans for Temptation and Labrette. She stopped entering Temptation in competitions because he was lame.  However, she did not adopt a new technique for becoming profitable because she was already breeding Temptation.  In fact, petitioner continued to breed Temptation even though the two foals produced by Temptation before the years in issue were far below her expectations.

Petitioner changed her plan from breeding Labrette to competing her.  Petitioner contends that Labrette's success could help her horse breeding activity become profitable, but we are not convinced that she compared the expenses with the profit potential.  This suggests she cared about sports success, not business success.

Petitioner testified that petitioners moved to Florida, and then relocated in Florida, to be near dressage activities. Petitioners also point out that petitioner culled her herd in 1987 when she donated three thoroughbred mares to a Gainesville breeding program.  However, petitioner did not show how these changes would make her horse breeding activity profitable.

### f.    Advertising

The record includes copies of six advertisements for Serenity Farms and Temptation that petitioner placed before the

years in issue.[2]  Petitioner's limited advertisements do little
to show that she conducted her activity in a businesslike manner.

g.    Emerson

Emerson testified that petitioner operated her activity in a
businesslike manner.  We disagree.  Emerson first met petitioner
in 1993 or 1994.  He did not know how much she earned from stud
and boarding fees or the sale of foals.  He never saw business
records or a business plan for petitioner.

Emerson was a member of the U.S. Equestrian Team that
competed in the 1974 world championships and the 1976 Olympics.
He was national 3-day champion in 1976 and 1979.  Emerson
attributes his financial success to his personal fame.
Petitioner lacked this advantage.

Emerson received gross receipts of about $50,000 from
breeding 3 stallions and 75 to 80 mares.  The rest of his income
was from clinics and training.  Petitioner had one lame stallion
and a few mares.  She had no income from training or clinics.

Emerson's conclusion that breeding Temptation could have
been profitable is not enough to show that petitioner had an
actual and honest profit objective.

This factor favors respondent.

---

[2] Petitioners deducted advertising expenses of $878 for
1988, $628 for 1989, and $632 for 1990.  The record includes no
information about these expenses.  In 1991, petitioner advertised
that Labrette was for sale.

2.  The Expertise of the Taxpayers or Their Advisers

Efforts to gain experience and a willingness to follow expert advice are considered in deciding if a taxpayer has a profit objective.  Sec. 1.183-2(b)(2), Income Tax Regs.

Petitioner studied breeding and competition and learned much about horses and breeding techniques.  She learned to deliver foals on her own and learned about artificial breeding techniques.  However, she erroneously thought Temptation was from Switzerland when she bought him, and her costs to quarantine her horses for more than 3 days would not have been unexpected if she had known the quarantine rules.

Petitioner did not seriously study the business of breeding and selling horses or show how her skills would lead to the financial success of her horse activity.  Petitioner's horse trainers and riders apparently advised her on horse buying, training, and showing, not on how to make a profit.  These facts suggest that petitioner lacked a profit motive.  See Rinehart v. Commissioner, supra (horse activity owner employed horse professionals but not for business advice).

This factor favors respondent.

3.  Taxpayer's Time and Effort

The fact that a taxpayer devotes much time and effort to conducting an activity may indicate that he or she has a profit objective.  Sec. 1.183-2(b)(3), Income Tax Regs.

Petitioner usually spent long hours working with her horses.

On balance, this factor favors petitioners.

4.   <u>Expectation That Property Used in the Activity Would
     Appreciate in Value</u>

A taxpayer may expect, despite the lack of profit from current operations, that an overall profit will result when appreciation in the value of assets used in the activity is realized.  <u>Bessenyey v. Commissioner</u>, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(b)(4), Income Tax Regs.  There is an overall profit if future net earnings and appreciation are sufficient to recoup losses sustained in prior years.  <u>Bessenyey v. Commissioner</u>, <u>supra</u>.

Petitioners contend that this factor favors them because petitioner expected that their horses would appreciate in value. We disagree.  Petitioners offered no evidence showing which of their horses would appreciate or the amount of appreciation they expected.  Temptation's potential value decreased substantially after he was injured in 1983, which was at least 5 years before the years in issue.  The two foals by Temptation were of far less quality than petitioner expected.  By the years in issue, petitioner did not reasonably expect Temptation's value to increase.  Petitioner sold Donka for $1,500 in 1989.

Until 1988, Labrette had not produced any valuable offspring.  It is true that Labrette could appreciate in value, but there is no evidence showing how much that appreciation could be.  We are not convinced that petitioner expected the appreciation of her horses to exceed her total losses.

On balance, this factor favors respondent.

5.  Taxpayer's Success in Other Activities

The fact that a taxpayer has previously engaged in similar activities and made them profitable may show that the taxpayer has a profit objective, even though the activity is presently unprofitable. Sec. 183-2(b)(5), Income Tax Regs.

Petitioner testified that she profitably bred dogs from 1966 to 1984. However, her testimony on this point was at best vague. She said she sold a total of about 10 to 15 puppies. Petitioners did not report any income from this activity on their tax returns that are in the record (1978 to 1984), and petitioners provided no information about any income from dog breeding before 1978. Petitioners did not show that petitioner's work at Kelly or Winnipesocki Airlines had any bearing on her ability to conduct a profitable horse activity.

This factor favors respondent.

6.  Taxpayer's History of Income or Losses

A history of substantial losses may indicate that an activity was not conducted for profit. Golanty v. Commissioner, supra at 427; sec. 1.183-2(b)(6), Income Tax Regs.

Petitioner had losses from the horse activity each of the 12 years from 1979 to 1990. She had losses in those years totaling $749,338 and income of $60,838. Losses during the initial stage of an activity do not necessarily indicate that the activity was not conducted for profit. Engdahl v. Commissioner, 72 T.C. at 669; sec. 1.183-2(b)(6), Income Tax Regs. Petitioners contend that the losses occurred during the startup phase. We disagree.

We have said that the startup phase of a horse breeding activity may be 5 to 10 years.  Engdahl v. Commissioner, supra. Petitioner had losses for 12 years.

Petitioner contends that this case is similar to Perry v. Commissioner, T.C. Memo. 1997-417; Shane v. Commissioner, T.C. Memo. 1995-504; Arwood v. Commissioner, T.C. Memo. 1993-352; and Pirnia v. Commissioner, T.C. Memo. 1989-627, where we found that taxpayers had a profit motive despite having a history of losses. We disagree.  Those cases differ from this case for several reasons.  In Perry v. Commissioner, supra, the taxpayer had losses from 1986 to 1993 during the startup period and a profit in 1994.  The taxpayers in Perry expected their land appreciation to more than offset their losses.

The other cases cited by petitioner are also distinguishable.  In Shane v. Commissioner, supra, the taxpayer had losses from 1986 to 1991 from racing the taxpayer's horses but had profits in prior years.  He bought an inexpensive horse in 1988 and made a profit, winning about $65,000 in 18 months. He kept his costs low.  He stopped racing horses when it became unprofitable and focused on breeding.  We found that he reasonably expected that his horses would increase in value.  His 1990 and 1991 losses occurred within 5 to 10 years of when he started to breed horses.  Petitioners had considerably more income than the taxpayer in Shane who earned $42,000 in 1990 and $38,000 in 1991 from sources not related to horses and had

expenses for his horse activity of $39,324 for 1990 and $36,039 for 1991.

The taxpayer in Arwood v. Commissioner, supra, had losses from 1981 to 1987. He emphasized the business of horse breeding. He had a written business plan and relied on experts for business advice. He believed that his horses would be profitable because his horse's half-brother received $10,000 per breeding, and the sire of his horse received $40,000 per breeding. Petitioner focused little on making money.

In Pirnia v. Commissioner, supra, the Commissioner determined a deficiency in income tax for 1982, the year after the taxpayer bought her first horse. The taxpayer relied on experts for financial advice. She expected profits to exceed her losses. She could not rely on income from her physician husband to pay for her horse activity because they were experiencing marital difficulties. She discontinued show activities which were unprofitable to concentrate on breeding.

This factor favors respondent.

7. Amount of Occasional Profits, If Any

Small occasional profits with large continuous losses do not indicate that the taxpayer had a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioner's losses were large and continuous from 1979 when she started to 1990, the last year in issue.

Losses caused by unforeseen circumstances do not necessarily indicate that a taxpayer lacked a profit objective. See Engdahl

v. Commissioner, supra at 669; Phillips v. Commissioner, T.C. Memo. 1997-128; Briggs v. Commissioner, T.C. Memo. 1994-125; Leonard v. Commissioner, T.C. Memo. 1993-472; sec. 1.183-2(b)(6), Income Tax Regs. Petitioners contend that their losses in the years in issue were caused by unforeseen circumstances, such as Temptation's injury, the death of a foal, Labrette's bowed tendon, and lack of customers. Petitioners point out that Emerson said that Temptation would have been profitable if he had not been injured.

Temptation never performed at better than the intermediate dressage level. We do not know if Temptation would have reached the highest levels of dressage, or if petitioner's activity would have been profitable if Temptation had not been injured. It is also unknown if petitioner's activity would have been profitable if Labrette's foal by Temptation had not been injured in 1983. See Burger v. Commissioner, 809 F.2d 355 (7th Cir. 1987), affg. T.C. Memo. 1985-523 (taxpayer did not show that activity would have been profitable if the unforeseen circumstance had not occurred). These injuries occurred at least 5 years before the first year in issue.

Petitioner did not campaign Labrette until 1990, the last year in issue. Labrette bowed a tendon after the years in issue. Thus, that injury did not affect the years in issue.

A small chance to make a large profit may indicate that a taxpayer has a profit objective even if he or she has large continuous losses. Sec. 1.183-2(b)(7), Income Tax Regs.

Petitioners contend that this factor favors them because they were like the taxpayer in Shane v. Commissioner, supra, where we found that the taxpayer had a profit objective. We disagree. Petitioners have not shown that they had any chance to make a profit or even to recoup their losses.

This factor favors respondent.

8. Financial Status of the Taxpayer

Substantial income from sources other than the activity, especially if the losses generate substantial tax benefits, may indicate that the taxpayer is not conducting the activity for profit. Sec. 1.183-2(b)(8), Income Tax Regs.

Petitioners contend that they did not have a large amount of income. We disagree. Mr. Lundquist received total wage income of $254,874 from Delta Airlines during the years in issue. Petitioners' income from interest and IRA and pension distributions totaled $285,800 for the years in issue. See Rinehart v. Commissioner, T.C. Memo. 1998-205 (taxpayers lacked profit objective where taxpayer earned between $166,000 and $170,000 per year during the years in issue).

Petitioners contend that they had limited financial means and point out that petitioner bought the three horses with money petitioners raised by mortgaging property. Petitioners had ample income, and they did not show that they had to mortgage property to finance the horse activity.

This factor favors respondent.

9.   Elements of Personal Pleasure

The presence of recreational or personal motives in conducting an activity may indicate that the taxpayer is not conducting the activity for profit.  Sec. 1.183-2(b)(9), Income Tax Regs.  A taxpayer's enjoyment of an activity does not show that the taxpayer lacks a profit objective if the activity is, in fact, conducted for profit as shown by other factors.  Jackson v. Commissioner, 59 T.C. 312, 317 (1972); sec. 1.183-2(b)(9), Income Tax Regs.  However, if the possibility for profit is small compared to the possibility for gratification, the latter possibility may be the primary motivation for the activity.  White v. Commissioner, 23 T.C. 90, 94 (1954), affd. per curiam 227 F.2d 779 (6th Cir. 1955).

Petitioners point out that petitioner did not ride horses in the years in issue and that she worked hard.  Despite this, petitioner loves animals and has enjoyed being around horses since childhood.  Considering petitioner's unlikelihood of profit, we conclude that this factor favors respondent.

C.   Conclusion

We conclude that petitioner did not operate her horse breeding activity for profit in 1988, 1989, and 1990 for purposes of section 183.

To reflect the foregoing,

Decision will be entered

for respondent.