T.C. Memo. 2000-101


UNITED STATES TAX COURT


HARVEY J. DAVIS AND PATRICIA A. DAVIS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7691-98.                    Filed March 27, 2000.


James F. McLeod, for petitioners.

C. Glenn McLoughlin and Brian A. Smith, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge:  Respondent determined deficiencies in petitioners' Federal income tax and a penalty under section 6662 as follows:

|       |            | Penalty   |
| Year  | Deficiency | Sec. 6662 |
| 1994  | $9,614     | $1,914    |
| 1995  | 11,855     | 2,356     |
| 1996  | 9,956      | 1,978     |

The issues for decision are:

1.  Whether petitioners operated their Arabian show horse activity for profit in 1994, 1995, and 1996.  We hold that they did.

2.  Whether petitioners are liable for accuracy-related penalties under section 6662(a) for substantial understatement of tax for 1994, 1995, and 1996.  We hold that they are not.

References to petitioner in the singular are to Harvey J. Davis.  Section references are to the Internal Revenue Code in effect during the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.  Petitioners

Petitioners resided in Springfield, Missouri, when they filed their petition.

1.  Petitioner

Petitioner is an architect.  From 1958 to 1965, he was a partner with Johnson & Davis Architects.

In 1965, petitioner and a partner bought the patent rights to a chemically reactive cement product.  Petitioner and his

partner formed M&D Enterprises, Inc. (M&D), to develop and market the product. Petitioner was president of M&D from 1965 until it was dissolved in December 1995.

Before he acquired the patent rights, petitioner investigated the cement product by himself and with the assistance of an engineer and chemist. He also investigated the prior owner's books and how the prior owner conducted business. Based on these investigations, petitioner believed that the product was valuable and that the prior owners had mismanaged the business. Petitioner established a plant to manufacture the product and a sales force to market the product. The operation became profitable after 6 years.

In 1975, petitioner founded and became president of International Materials Corp. (IMC). IMC was formed to license the cement product in countries other than the United States. IMC licensed the cement patent to foreign manufacturers. In the early 1980's, M&D's patent expired, and the company closed its U.S. plant and ceased international licensing. After the patent expired, M&D could no longer collect royalties.

Since 1980, petitioner has appeared as an expert witness in construction litigation cases.

In 1994, petitioner acquired a truck stop and restaurant in Cabool, Missouri, now known as Midwest Truck Stop, for $500,000. Petitioner reviewed Midwest Truck Stop's financial records before

buying it. He believed that it was making money and had a great location. Petitioner has operated it as a Schedule C business since 1994. Petitioner bought Midwest Truck Stop because he was looking for a good business for his son, Gaylan, to operate. They also had considered buying convenience stores, but the stores were not making much money. Gaylan has managed Midwest Truck Stop since 1994. Midwest Truck Stop has been profitable, and the value of its stock has increased since petitioner bought it in 1994.

In 1997, petitioner bought the Greenfield Trading Post, a gas station and convenience store. Petitioner has operated Greenfield Trading Post as a Schedule C business since 1997.

Petitioner maintains detailed accounting records for Midwest Truck Stop and the Greenfield Trading Post. Greenfield Trading Post has daily computerized financial reports which petitioner reviews twice a week. Midwest Truck Stop has a manual ledger system with quarterly and annual reports. Midwest Truck Stop also tracks large inventory items (such as fuel) daily.

2. Mrs. Davis

Mrs. Davis began her career as a computer operator at Southern Colorado State University, where she worked from 1964 to 1970. She has worked for Dillons Stores, a retail grocery chain, since 1978. She worked as a cashier from 1978 to 1979, as a head cashier from 1979 to 1987, and as an office manager since 1987.

3.  <u>Petitioners' Residence</u>

On September 9, 1971, petitioners bought a house with 1,638 square feet and 5 acres of land (referred to here as the property) on West Farm Road 82, Springfield, Missouri, for $23,500.  They have lived there since 1971.  Petitioners kept cattle on their property from 1971 to 1974.  Petitioners made the following improvements to their residence from 1974 to 1987:

| Improvement | Date | Cost |
|---|---|---|
| Enclose and convert garage into family room with fireplace | 11/74 | $2,300 |
| Remodel kitchen | 6/79 | 4,000 |
| Install central A/C | 7/85 | 2,100 |
| Enclose and convert carport into garage | 5/87 | 3,200 |

The real estate market in Springfield, Missouri, was fairly stable from 1990 to 1994.  In 1994, prices increased by about 10 percent.  Prices have increased about 1-3 percent annually since then.

Petitioners maintained $70,200 of property and casualty insurance coverage on their residence in 1996.  They raised the property and casualty coverage on the residence to $74,500 in December 1998.

B.   Petitioners' Arabian Horse Activity

1.   Petitioners' Early Involvement With Horses

Petitioner owned a half Arabian gelding in his youth.  He trained the horse and entered it in calf roping exhibitions from 1942 to 1954.

In 1971, petitioners attended an Arabian horse show in Albuquerque, New Mexico.  Petitioner had never seen a purebred Arabian horse and was very impressed.  Petitioners ascertained the price of some of the horses at the show.  They also visited several Arabian horse farms and looked at the facilities.  They wanted to own and raise Arabian horses someday.

Also in 1971, petitioners bought for pleasure a purebred Arabian gelding named Alasana.  Mrs. Davis and petitioners' children learned to ride Alasana, and the children showed him in 4-H shows.  Alasana died in 1985.

In 1990, Mrs. Davis visited Mountain View Arabians, an Arabian horse farm in Colorado, that was owned by a woman in her seventies.  The owner had raised Arabian horses all her life and was still showing horses.  In 1990, petitioners visited the McDannald Arabian farm, owned by Paul McDannald (McDannald).  McDannald trains, shows, and breeds horses, and teaches others how to show horses.  McDannald is a well-known horse trainer.

In 1990, petitioners visited two Arabian horse farms they had visited in 1971.  They preferred the McDannald Arabian farm

because it had big new barns, more horses, more stallions, and 30 or more horses being trained for clients.

2. Petitioners' Plans and Preparation

When they started their horse activity, petitioners chose McDannald to advise them on the training, breeding, and showing of their horses. McDannald advised petitioners sometime after they started their horse activity that they did not need to buy more land for it. He told them they should buy hay to feed their horses rather than land on which to grow it.

In 1990, petitioners did not visit or know anyone with an Arabian horse farm which was comparable to their own horse activity. The McDannald Arabian horse farm was much larger and not comparable to petitioners' horse activity because McDannald trained horses but petitioners did not. Petitioners did not review the financial records of any Arabian horse operators before starting their own Arabian show horse activity in 1990.

Petitioners began to operate their horse activity in 1990. In 1990, petitioner drafted a business plan for 1991 to 1997 for petitioners' horse activity. Petitioners' business plan for the years in issue was to buy inexpensive horses and to try to increase their value by training and showing them.

The plan analyzed costs to raise and train a horse. Petitioner estimated that it would cost $6,545 plus labor to breed and raise an Arabian colt for 3 years. However, petitioner

was able to reduce some of his costs; for example, he estimated that stud fees would be $1,500 and that it would cost $3 per day to feed each horse.  The stud fee for breeding petitioners' horses to McDannald's horse, Rumadii, was only $500.  Petitioner bought hay from his neighbor and paid to have it cut and baled, reducing the daily cost of feed per horse to 51 cents.

The business plan included horse pedigree listings and descriptions of some Arabian horses.  It also included petitioners' plans for breeding and showing the horses and building facilities for them.  Petitioner concluded that they had to raise extraordinary horses to be profitable.  Petitioner studied the bloodlines and history of Arabian horses back 100 years.  He traced the ancestors of one of petitioners' mares, Vendalita, as far back as possible.  He believed that he could learn how to breed better horses by studying Arabian horse genealogy.  He believed that it would take him 10-13 years before the activity would be profitable, in part because it can take up to 5 years for an Arabian horse to reach maturity.

Petitioners have been members of the Southwest Missouri Arabian Association, the International Arabian Horse Association of Missouri, the American Horse Show Association, the Southwest Missouri Horse Show Association, and the Arabian Registry since 1991.  Petitioners are registered as breeders with the Arabian Registry.

3. <u>Initial Stock</u>

In 1990, petitioners acquired two Arabian geldings, Pryncz for $200 and Prince Hilal for $500. Petitioners took Pryncz and Prince Hilal to McDannald to be broken and trained. Petitioner believed that the geldings would become more valuable if McDannald broke and trained them. Neither of the geldings was ever shown. Pryncz has a physical defect in his throat that prevents him from being a successful show horse. This defect was discovered during training.

Also in 1990, petitioners acquired from McDannald two Arabian mares, Brigitta La Brisa and Vendalita, each for $2,000. Petitioners agreed to give McDannald the right to a foal from Vendalita as part of her purchase price. Petitioner believed the value of the right to Vendalita's first born foal was $3,000-$4,000.

Petitioners intended to use Brigitta La Brisa as a broodmare and to breed her to Rumadii in 1992. Rumadii had already successfully sired Brigitta La Brisa's filly, Vendalita.

Brigitta La Brisa had produced a filly, Vendalita, in 1985, and a colt, Mundo, in 1987. Petitioners did not ask McDannald whether Brigitta La Brisa had potential breeding problems before they bought her, nor did McDannald mention any breeding problems with the mare. However, Brigitta La Brisa had substantial breeding problems after petitioners acquired her. In 1993, 1995,

and 1996, unsuccessful attempts to breed Brigitta La Brisa were made.  Her breeding problem resulted from the fact that she had not been bred for several years when petitioners acquired her. Brigitta La Brisa produced a filly, Spanish Ballerina, in 1998. Petitioners kept Spanish Ballerina, but she has no show record. Petitioners have never shown Brigitta La Brisa.

Petitioners acquired Vendalita for her show potential and her potential use as a broodmare.  Vendalita had not been broken, shown, or bred when petitioners acquired her.  Petitioners have shown Vendalita with some success.  Vendalita has produced two colts, Serrino in 1996, and Brilliant in 1997.  Petitioners gave Serrino to McDannald as part of Vendalita's purchase price. Petitioners kept Brilliant, but he has no show record.

In 1993, McDannald advised petitioners to buy an Arabian gelding named Splendante.  Petitioners bought Splendante for $3,000 and showed him with some success.

In 1995, petitioners acquired an Arabian mare named That's Amore.  They agreed to give her prior owners the right to a foal from Brigitta La Brisa and the right to a foal from That's Amore. Petitioner estimated that those foal rights were worth $3,000 to $4,000 each.

Petitioners have shown That's Amore.  Before petitioners acquired her, That's Amore produced two colts, Ligon in 1988 and

Splendante in 1990, and a filly, De Lovelt, in 1991. That's Amore has produced no other offspring.

In 1997, petitioners acquired an Arabian stallion, HB Canadian Dsign, for $4,000. Petitioners have shown HB Canadian Dsign.

Six of petitioners' nine horses--Brigitta La Brisa, Vendalita, That's Amore, Splendante, Brilliant, and Spanish Ballerina--were sired by one of two stallions that McDannald imported from Spain and that he used in his breeding program.

4. Improvements to Petitioners' Residence for Use in the Horse Activity

In 1990, petitioners' residence was appraised at $65,000. From 1990 to 1994, petitioners made improvements to their residential property to accommodate their Arabian horse activity. They built a barn to store hay and equipment; a five-stall stable with a tack room, workshop, and storage area for hay and a horse trailer; a 50- by 100-foot arena; and a corral. During that time, they also acquired equipment such as a horse trailer and a used pickup truck. The improvements cost about $23,000. Petitioner planned and built most of the farm improvements himself. He built the barn for the horses by himself in 1990. He built the stable for the horses in 1990. He did not do the concrete work or build the structure or roof of the stable, but he installed the flooring and the siding and built the stalls and tack room.

Petitioner built the arena in 1990 by himself for the horses to exercise. Petitioners do all of the maintenance and repairs on the fence and the buildings.

In December 1998, petitioners' property, including the farm improvements, was worth $155,000. The farm improvements had a fair market value, as of December 23, 1998, of $47,000.

5. <u>Operations</u>

Petitioners spent much of their free time training, showing, and caring for their horses. In 1995, petitioner spent more than 1,600 hours and Mrs. Davis spent more than 700 hours on the horse activity. Petitioner had no other full-time employment during the years in issue.

Petitioner spent a large amount of time each week from 1991 through the years in issue caring for and training petitioners' horses at the McDannald Arabian facility. Petitioners provided all of the care for their horses except when the horses were at McDannald's farm.

Petitioners were actively involved in preparing their horses for the show ring during the years in issue. Petitioners filmed each of their horses at horse shows so they could critique their performance.

In 1994, petitioners named their horse activity "Midwest Spanish Arabians". In 1995, petitioner began to use letterhead with the Midwest Spanish Arabians logo for their horse activity.

During the years in issue, petitioners advertised their horses primarily by showing them at horse shows. They also had baseball caps made bearing the Midwest Spanish Arabians logo. Petitioners sold some and gave away some of these caps. They advertised horses for sale by word of mouth and once in the newspaper.

Petitioner did not insure his horses.

In July 1990, petitioners obtained from Empire Bank a $15,000 home equity line of credit, secured by a mortgage on their residence. They used the line of credit to finance some of the improvements to the property that they planned to use in their Arabian horse breeding activity.

Petitioners did not have a separate bank account for their Arabian horse activity. Petitioners paid the expenses for their horse activity from their personal account.

Petitioners have kept records of the income and expenses of their Arabian horse activity since 1990. Petitioner kept receipts for expenses and he made notes on the expense checks. At the end of each year, petitioner prepared a summary of expenses and gave it to his accountant to prepare petitioners' income tax return.

Petitioner kept a ledger beginning in 1990 of petitioners' expenses from 1990 to 1993. Beginning in 1994, Mrs. Davis used a computer to keep a record of income and expenses. However, the

computer data was lost sometime thereafter and petitioners resumed keeping their receipts and handwritten summaries.

6. Petitioners' Personal Enjoyment of Horses

Petitioners ride their horses only to train or show them. Petitioners' children and grandchildren do not ride petitioners' horses.

Petitioner finds his Arabian horse activity to be rewarding. He enjoys showing the horses, competing at the shows, and the camaraderie of other horse people at the shows. Petitioner does not enjoy the amount of driving that is required to participate in horse shows or to train petitioners' horses at McDannalds.

7. Petitioners' Gross Income, Appreciation, and Horse-Related Losses

Petitioners reported the following amount of taxable income on their tax returns from 1990 to 1996:

| Year | Taxable income (other than horse activity) | Horse income | Horse expenses including depreciation | Depreciation | Horse losses | Taxable income |
|------|------|------|------|------|------|------|
| 1990 | $263,832 | -0- | ($10,938) | ($3,600) | ($10,938) | $252,894 |
| 1991 | 49,749 | $120 | (20,544) | (6,369) | (20,424) | 29,325 |
| 1992 | 46,824 | 205 | (19,652) | (4,729) | (23,935) | 22,889 |
| 1993 | 44,498 | 190 | (23,346) | (3,912) | (23,172) | 21,326 |
| 1994 | 57,596 | 295 | (26,018) | (4,493) | (25,723) | 31,873 |
| 1995 | 60,215 | 519 | (33,478) | (3,490) | (32,959) | 27,256 |
| 1996 | 55,969 | 434 | (29,164) | (2,572) | (28,730) | 27,239 |

Petitioners reported on financial statements dated August 11, 1992, and June 11, 1993, that their horses were worth $34,000. They reported on a financial statement dated July 21, 1995, that their livestock was worth $80,500.

Petitioners' expert, Diane O'Connor (O'Connor), appraised petitioners' Arabian horses in April 1998.  At that time, petitioners had the following amounts of unrealized appreciation in the horses they owned or that were born to horses they owned during the years in issue:

| Horse | Cash basis | Foal right | Total cost | 1998 Value | 1998 Appreciation |
|---|---|---|---|---|---|
| Pryncz Prince | $200 | none | $200 | $5,000 | $4,800 |
| Hilal Brigitta | 500 | none | 500 | 4,500 | 4,000 |
| La Brisa | 2,000 | $3,000 | 5,000 | 20,000 | 15,000 |
| Vendalita | 2,000 | 3,000 | 5,000 | 25,000 | 20,000 |
| Splendante | 3,000 | none | 3,000 | 28,000 | 25,000 |
| That's Amore | none | 6,000 | 6,000 | 30,000 | 24,000 |
| Brilliant Spanish | none | none | 0 | 5,000 | 5,000 |
| Ballerina | none | none | 0 | 10,000 | 10,000 |
| Total | | | | | 107,800 |

OPINION

A.  Whether Petitioners Operated Their Arabian Show Horse Breeding Activity for Profit

The issue for decision is whether petitioners operated their Arabian show horse breeding activity for profit in 1994, 1995, and 1996.

A taxpayer conducts an activity for profit if he or she does so with an actual and honest profit objective.  See Osteen v. Commissioner, 62 F.3d 356, 358 (11th Cir. 1995), affg. in part and revg. on other issues T.C. Memo. 1993-519; Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205

(D.C. Cir. 1983). In deciding whether petitioners operated their show horse activity for profit, we apply the following nine nonexclusive factors: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. See sec. 1.183-2(b), Income Tax Regs. No single factor controls. See Osteen v. Commissioner, supra; Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); sec. 1.183-2(b), Income Tax Regs. Petitioners have the burden of proof. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

Petitioners called two expert witnesses. O'Connor appraised petitioners' horses. James Truitt (Truitt) appraised petitioners' property, including their residence and farm improvements. As discussed below, petitioners have proven that the appreciation in their horses and farm improvements was

substantial in relation to their losses in the fifth through seventh year of operating their horse activity.

B.   Applying the Factors

1.   Manner in Which the Taxpayer Conducts the Activity

Maintaining complete and accurate books and records, conducting the activity in a manner substantially similar to comparable businesses which are profitable, and making changes in operations to adopt new techniques or abandon unprofitable methods suggest that a taxpayer conducted an activity for profit. See Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

Respondent contends that petitioners' business plan was inadequate because it contained little information about the economics of the horse activity, and its financial projections showed that petitioners would lose money from the activity. Respondent contends that petitioners did not adequately investigate other Arabian horse farms before they began their horse activity because they did not examine the books and records of other breeders and they visited much larger horse farms that were involved in all aspects of the Arabian horse business. Respondent contends that petitioners did not run the horse activity in a businesslike manner because petitioners used the same bank accounts for their horse activity and their personal expenses.   Respondent further contends that petitioner did not

investigate the acquisition of or operate the horse activity in the same way he ran his other profitable businesses.

We disagree that petitioners did not conduct their horse activity in a businesslike manner. Petitioner had a specific concept clearly in mind and pursued it consistently. He had a business plan in 1990 for petitioners' horse activity, and he generally followed that plan. Petitioners' plan appropriately considered the costs of operating the activity. Although petitioners' business plan did not include a detailed written budget, petitioners' plan is evidenced by their actions. See Phillips v. Commissioner, T.C. Memo. 1997-128 (taxpayers engaged in Arabian horse breeding activity for profit; their actions constituted a business plan despite the fact that they had no financial plan or written budget). Petitioners consulted with and relied on a well-known expert, built a barn, stable, and arena, registered with the Arabian Registry as breeders, and filmed their horses' performances at horse shows to critique the performance.

Petitioners kept complete financial books and records of their horse activity. Petitioners also kept detailed records on the horses and their training to monitor their successes and failures. We think the differences in books and records between the horse activity and their other businesses are understandable

because the years in issue were the early stages of the horse activity, which was very different from their other businesses.

Petitioners kept their expenses as low as possible. Petitioner built most of the barn, stable, and exercise arena himself.  He significantly reduced some of his costs, such as stud fees and the daily cost of feed per horse.  Also, petitioners sometimes negotiated reducing the purchase prices of horses by offering a foal for a reduction in the cash price.

Respondent points out that the "show files" that petitioners kept for each horse were not contemporaneously prepared but were assembled in 1997.  We infer nothing from this because the preparation of the show files was based on information that petitioners had contemporaneously.

This factor favors petitioners.

2.   <u>The Expertise of the Taxpayers or Their Advisers</u>

Efforts to gain experience, a willingness to follow expert advice, and preparation for an activity by extensive study of its practices may indicate that a taxpayer has a profit motive.  See sec. 1.183-2(b)(2), Income Tax Regs.

Respondent contends that petitioners lacked expertise in running a successful horse business, and that, although petitioner studied the history of the Arabian horse and its bloodlines, he spent little time investigating the business aspects of an Arabian horse activity.  Respondent contends that

petitioners did not consistently rely on the advice of their expert, McDannald. Respondent contends that, although petitioners relied on McDannald to advise them about training, breeding, and showing their horses, their principal adviser and decision maker for buying and selling Arabian horses was Mrs. Davis.

We disagree. At trial, petitioner testified that Mrs. Davis made decisions as to acquisitions of property. We construe this to mean that she made decisions to buy real property, not horses. Petitioners sought and relied on the advice of McDannald, a nationally known trainer of Arabian horses, about which horses to buy. For example, McDannald advised petitioners to buy Splendante in 1993. McDannald, however, did not advise petitioners how to make a profit.

This factor is neutral.

3.   <u>Taxpayer's Time and Effort</u>

The fact that a taxpayer devotes much time and effort to conducting an activity may indicate that he or she has a profit objective. See sec. 1.183-2(b)(3), Income Tax Regs. Petitioners spent a substantial amount of time and effort on their Arabian horse activity. Respondent concedes that this factor favors petitioners.

4.  Expectation That Property Used in the Activity Would Appreciate in Value

A taxpayer may intend to make an overall profit when appreciation in the value of assets used in the activity is realized.  See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(b)(4), Income Tax Regs.  There is an overall profit if net earnings and appreciation are enough to recoup losses sustained in prior years.  See Bessenyey v. Commissioner, supra.

Respondent contends that petitioners had no realistic expectation of recouping their losses from the horse activity through appreciation of their assets.  We disagree.  Petitioners provided expert appraisal testimony from O'Connor and Truitt.  Respondent called no witnesses and left petitioners' appraisals substantially unrebutted.  We conclude that petitioners have proven that the appreciation in their horses and farm improvements was substantial in relation to their losses and that they reasonably expected appreciation to exceed their losses.

a.  Horse Appreciation

Respondent contends that petitioners did not expect their horses to increase substantially in value because petitioners did not discuss horse appreciation in their business plan.  Respondent points out that petitioners' business plan contained no projections of appreciation in the value of their farm improvements or horses.

We disagree. Petitioners' financial statements for 1992, 1993, and 1995 show that petitioners believed their horses were valuable and were increasing significantly in value. Petitioner credibly testified that he expected petitioners' horses and farm improvements to appreciate in value and that he expected to recover his losses by selling the appreciated assets. Thus, we give little weight to the fact that petitioners' business plan contained no projections of appreciation in the value of petitioners' business assets.

Petitioners' expectations were substantially corroborated by appraisals they obtained from O'Connor. Respondent did not challenge O'Connor's appraisals for most of the horses except to point out that she used a 1998 valuation date.

Respondent contends that O'Connor did not consider the effect Brigitta La Brisa's inability to breed from 1990 to 1997 had on her value in 1996. We disagree. O'Connor did consider the fact that Brigitta La Brisa had difficulty breeding because she appraised her with foal ($30,000) and without foal ($20,000). Using the $20,000 amount in estimating the appreciation in value of petitioners' horses, petitioners still had a substantial amount of appreciation from their horses.

Respondent contends that petitioners should not have included Brilliant and Spanish Ballerina in their estimate of appreciation because they were born after 1996. We disagree.

Petitioners owned broodmares Brigitta La Brisa and Vendalita and expected them to produce foals. Thus, they reasonably expected that owning Brigitta La Brisa and Vendalita would lead to their owning foals.

Respondent also contends that petitioners should not include the value of HB Canadian Dsign, a horse they bought in 1997, in their estimate of appreciation from their horses in the years in issue. Respondent further contends that petitioners failed to include the foal rights from Brigitta La Brisa, Vendalita, and That's Amore in their acquisition costs for those horses and that the value of the foal rights reduces petitioners' anticipated appreciation. We agree with respondent on both of these points, and we have corrected for it in our analysis.

Petitioners' horses had appreciated by $107,800 as of their 1998 appraisal. This generally corroborates petitioners' expectation before and during the years in issue that the value of petitioners' horses would increase substantially.

      b.   <u>Appreciation in Petitioners' Residence and Farm Improvements</u>

Petitioners contend that we should consider appreciation in their farm property in applying this factor.

Truitt estimated that petitioners' farm improvements (i.e., the barn, stable, and arena) as of December 21, 1998, were worth $47,000. Petitioners' cost of the improvements was about $23,000. Thus, Truitt's testimony supports a finding that

petitioners' farm improvements had appreciated $24,000 by 1998. We assume the vast majority of this appreciation occurred as the improvements were made because they were self-constructed.

Petitioner expected that, for each dollar he spent on the farm improvements, it would increase the value of petitioners' property by $2. Also, as stated above, petitioners' horses and farm improvements appreciated significantly in value during the years in issue. Petitioners had a bona fide expectation of future profit. See Estate of Baron v. Commissioner, 83 T.C. 542, 553 (1984), affd. 798 F.2d 65 (2d Cir. 1986) (reasonable or realistic expectation of profit is not required if taxpayer has bona fide expectation of profit); Dreicer v. Commissioner, 78 T.C. at 643-645.

We are convinced that petitioners had appreciation in their horses and farm improvements during the years in issue of approximately the same order of magnitude as their losses in those years. Thus, we need not decide whether petitioners' residence and land also increased in value. Accordingly, this factor favors petitioners.

5. Taxpayer's Success in Other Activities

The fact that a taxpayer previously engaged in similar activities and made them profitable may show that the taxpayer has a profit objective. Sec. 183-2(b)(5), Income Tax Regs. Petitioners have not engaged in similar activities for profit,

but petitioner had engaged in other successful activities. Respondent concedes that this factor favors petitioners.

6.   Taxpayer's History of Income or Losses

A history of substantial losses may indicate that the taxpayer did not conduct the activity for profit.  See Golanty v. Commissioner, 72 T.C. at 427; sec. 1.183-2(b)(6), Income Tax Regs.   A taxpayer may have a profit objective even when the activity has a history of losses, see Bessenyey v. Commissioner, 45 T.C. at 274, because losses during the initial stage of an activity do not necessarily indicate that the activity was not conducted for profit, see Engdahl v. Commissioner, 72 T.C. at 669; sec. 1.183-2(b)(6), Income Tax Regs.  We have said that the startup phase of a horse-breeding activity may be 5 to 10 years for standardbred horses.  See Engdahl v. Commissioner, supra; Burrow v. Commissioner, T.C. Memo. 1990-621; Starr v. Commissioner, T.C. Memo. 1969-35.  A period of 5 to 10 years for the startup phase of an Arabian-breeding operation is not unreasonable.  See Phillips v. Commissioner, T.C. Memo. 1997-128 (losses incurred in years 7 through 9 from the taxpayers' Arabian horse activity were incurred in the startup phase of the activity and were due in part to unforeseen circumstances; losses did not indicate that the activity was not engaged in for profit).  In the instant case, the years at issue are years 5 through 7 of petitioners' activity.  Because petitioners' losses were during

the startup period of their activity, we conclude that this factor is neutral.

### 7.  Amount of Occasional Profits, If Any

The amount of any occasional profits the taxpayer earned from the activity may show that the taxpayer had a profit motive. See sec. 1.183-2(b)(7), Income Tax Regs.  Petitioners did not make a profit in any year.  Petitioners concede that this factor favors respondent.

### 8.  Financial Status of the Taxpayer

The receipt of a substantial amount of income from sources other than the activity, especially if the losses from the activity generate large tax benefits, may indicate that the taxpayer does not intend to conduct the activity for profit.  See sec. 1.183-2(b)(8), Income Tax Regs.

Respondent points out that petitioners had other sources of income available to offset their losses from the horse activity. Respondent points out that petitioners' losses reduced their taxable income by half in the years in issue.

Petitioners' other sources of income totaled $57,596 in 1994, $60,215 in 1995, and $55,969 in 1996.  They spent 40-50 percent of their income on their horse activity in the years in issue.  Of their losses, depreciation accounted for only 17.5 percent in 1994, 10.6 percent in 1995, and 9 percent in 1996. See Eisenman v. Commissioner, T.C. Memo. 1988-467 (the taxpayers

had a substantial amount of income from sources other than horse breeding but did not engage in the activity for pleasure; the Court viewed the fact that the taxpayers spent 46 and 69 percent of their adjusted gross income on the activity and derived insubstantial tax benefits as an indication that the activity was not a hobby).

This factor favors petitioners.

9.    Elements of Personal Pleasure

The presence of recreational or personal motives in conducting an activity may indicate that the taxpayer is not conducting the activity for profit.  See sec. 1.183-2(b)(9), Income Tax Regs.  A taxpayer's enjoyment of an activity does not show that the taxpayer lacks a profit objective if the activity is, in fact, conducted for profit as shown by other factors.  See Jackson v. Commissioner, 59 T.C. 312, 317 (1972); sec. 1.183-2(b)(9), Income Tax Regs.  However, if the possibility for profit is small compared to the possibility for gratification, the latter possibility may be the primary motivation for the activity.  See White v. Commissioner, 23 T.C. 90, 94 (1954), affd. per curiam 227 F.2d 779 (6th Cir. 1955).

Respondent contends that petitioner derived great pleasure from working with his horses, studying their bloodlines and the history of the Arabian horse, and showing the horses in

competition and that this weighs against finding that he engaged in the horse activity for profit.

We disagree. Petitioners and their family did not ride their horses for pleasure. Petitioner does not enjoy all the driving required to participate in horse shows or to go to McDannald's to train petitioners' horses. Petitioners showed their horses at horse shows as their primary method of advertising. There is a high correlation between success in horse shows and success in the marketplace. See Appley v. Commissioner, T.C. Memo. 1979-433; cf. Engdahl v. Commissioner, supra at 667; Golanty v. Commissioner, supra at 431 (taxpayers' failure to show horses indicated that taxpayers were not engaged in activity with a profit objective). Petitioners do not deny that they enjoyed many aspects of the horse activity. The fact that petitioners enjoyed the horse show competitions does not mean that they did not conduct their horse activity for profit. See Harvey v. Commissioner, T.C. Memo. 1988-13.

This factor favors petitioners.

10. Conclusion

Considering petitioner's testimony as corroborated by the record as a whole, particularly the time and effort petitioners spent on the activity, petitioners' reasonable expectation of profit from appreciation of the assets used in the activity, petitioner's business plan, and the startup nature of

petitioners' activity, we find that petitioners engaged in their Arabian horse activity for profit in the years in issue. Our holding should not be taken to mean that petitioners would prevail in any later year without further changes in their operating methods or results.

C.   Whether Petitioners Are Liable for the Penalty Under Section 6662 for Substantial Understatement

Respondent determined that petitioners are liable for the accuracy-related penalty for substantial understatement for 1994, 1995, and 1996 under section 6662.

Based on our holding that petitioners operated their Arabian horse activity for profit, petitioners are not liable for the accuracy-related penalty under section 6662.

Decision will be entered under Rule 155.