T.C. Memo. 2013-54

UNITED STATES TAX COURT

WILLIAM G. PEDERSON AND JAMIE K. PEDERSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10896-09.                    Filed February 20, 2013.

<u>Emily J. Kingston</u> and <u>Steven M. Katz</u>, for petitioners.

<u>Matthew A. Williams</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal

income tax of $329,001,[1] $212,430, $328,240, $26,507, $661,772, $597,141, and

$257,507 for tax years 1997, 1998, 1999, 2000, 2002, 2003, and 2004,

_____

[1]All dollar amounts are rounded to the nearest dollar.

[*2] respectively, as a result of disallowed deductions for expenses petitioners incurred in a horse breeding operation during 2002, 2003, and 2004 and disallowed net operating losses (NOLs) carried back to years 1997, 1998, 1999, and 2000. Respondent also determined accuracy-related penalties under section 6662(a)[2] of $65,800, $42,486, $65,648, $5,301, $132,350, $119,428, and $51,405 for 1997, 1998, 1999, 2000, 2002, 2003, and 2004, respectively. The issues for decision are:

(1) whether petitioners are entitled to deductions for various horse breeding expenses under either section 162 or section 212. We hold they are not; and

(2) whether petitioners are liable for the accuracy-related penalties under section 6662. We hold that they are.

## FINDINGS OF FACT

At the time the petition was filed, petitioners resided in South Dakota. Petitioners were married during all relevant years.

1. Petitioners' Backgrounds and Introduction to the ClassicStar Program

Mr. Pederson received undergraduate degrees in both economics and English from the University of Utah, as well as a master's in business

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] administration from the University of South Dakota in the mid-1980s. While living in South Dakota he worked for a time in his family's automotive parts distribution company and started a variety of businesses on his own, including a computer programing company, a natural gas distribution company, a printing company, a telephone company, and a trucking company. He also bought an additional automotive parts company. Mr. Pederson was not an expert in the areas of computing, natural gas, printing, trucking, or telephones, but he succeeded by hiring people familiar with those fields to run the operations of the businesses. He maintained only a supervisory role in most of his companies and sold several of them.

Mrs. Pederson received a degree in mechanical engineering from the University of Utah in 1978 and worked as a mechanical engineer from that time until 1996, when she retired.

In early 1999 petitioners moved to Utah. At that time Mr. Pederson remained associated with only the printing company and one of the automobile parts companies.

Since 1992 Mr. Pederson has been an active member of the Young Presidents Organization (YPO) in both the South Dakota and Utah chapters. The YPO has 19,000 members in approximately 80 chapters worldwide who meet to

**[*4]** share ideas. The organization has certain membership requirements such as the amount of business revenue and number of employees. Mr. Pederson characterized the YPO as an intimate organization whose members hold each other to certain standards of credibility and "purge out" members who lack credibility. Mrs. Pederson also participates in the YPO as Mr. Pederson's spouse; the organization has forums designated for spouses of members. Petitioners attended approximately 10 YPO meetings each year.

Petitioners met David Plummer and his wife at YPO meetings in 2000. Mr. Plummer ran a horse breeding business, ClassicStar, which qualified him to be a member of the YPO, and Mrs. Plummer was a member of the spouses forum. Another YPO member, Paul Bangeter, worked as a salesperson for ClassicStar. Several other YPO members had begun participating in a horse breeding program offered by ClassicStar. Mr. Pederson discussed ClassicStar with these individuals intermittently over the next two years, eventually attending a horse sale with Mr. Bangeter and visiting the ClassicStar office near Kaysville, Utah. Before meeting Mr. Plummer, petitioners had no experience in businesses involving horses.

Mr. Pederson attended several detailed meetings regarding ClassicStar during 2002. Through these meetings and conversations with other individuals he learned that the ClassicStar horse breeding program involved leasing mares owned

**[*5]** by ClassicStar, which would provide boarding and care for the mares and breed the mares to stallions. Any foals produced from the breeding would belong to petitioners.

Also in 2002 petitioners were presented with a booklet entitled "Due Diligence & Mare Lease Information Booklet" that contains information about the ClassicStar breeding program. The booklet, approximately 200 pages long, focuses mostly on the tax aspects of the ClassicStar breeding program although there is some discussion of horse breeding as well. The booklet contains: (1) a 53-page opinion letter from the law firm Handler, Thayer & Duggan, L.L.C. (Handler Thayer), regarding tax aspects of the horse breeding business; (2) a 22-page opinion letter from the accounting and consulting firm Karren, Hendrix & Associates, P.C. (Karren Hendrix), regarding tax aspects of the horse breeding business; (3) a 13-page opinion letter from Karren Hendrix regarding "tax issues associated with the exchange of ownership interests in a horse breeding business for a working interest in gas wells"; and (4) a 6-page opinion letter from Karren Hendrix regarding tax aspects of NOLs arising from a horse breeding business. Each of the opinion letters is addressed to Mr. Plummer.

The booklet encourages each "participant to involve his/her accountant fully" and states that ClassicStar "shall not act as a tax advisor". The booklet

[*6] states that ClassicStar has "the finest thoroughbreds", that the program will "enhance the Thoroughbred breed", and that through the program "you can lease the reproductive capacity of a Thoroughbred mare * * * bred to a quality stallion." The booklet further states that the investor owns foals produced as a result of their horse pairings and "has a number of options, including selling the foal, * * * racing the foal, or even doing a like-kind tax-free exchange" for the foal. Mr. Pederson reviewed the booklet, concentrating on the legal opinion and the requirements for NOL carrybacks. Mrs. Pederson did not look at the program as a business but looked at some of the materials regarding horses because it was "fun".

Petitioners traveled to Kentucky during 2002 to attend the Kentucky Derby and visit a farm run by ClassicStar in the State. They toured the operation, saw horses, met ClassicStar personnel, and attended presentations regarding the program. Petitioners were impressed with what they saw. They decided to enter the ClassicStar breeding program and created Sioux Breeders, LLC (Sioux Breeders), through which they would operate their activities. Sioux Breeders was a disregarded entity for tax purposes, and petitioners created a bank account for the entity with Home Federal Bank. Mr. Pederson had previously banked with Home Federal Bank.

**[*7]** 2.  Petitioners' 2002 Participation in the ClassicStar Program

On September 3, 2002, Mr. Pederson signed a letter of intent on behalf of Sioux Breeders committing to spending $3,111,710 on the ClassicStar breeding program in 2002 (2002 program).  According to the letter of intent, the 2002 program was to be funded with four payments:  (1) a September 10, 2002, downpayment of $311,271; (2) a November 1, 2002, payment of $753,083; (3) a December 1, 2002, payment of $492,001; and (4) a December 15, 2002, payment of $1,555,355.  Also on September 3, 2002, Mr. Pederson (on behalf of Sioux Breeders) signed with ClassicStar a Mare Lease and Breeding Agreement, a Boarding Agreement, a Foal Agreement, and a Nominee Agreement.

Petitioners did not negotiate any of the specific fees, costs, or expenses related to their participation in the 2002 program.  The amount petitioners committed to spend on the 2002 program was reached in part using an NOL calculator provided by ClassicStar, which was designed to maximize the tax refunds petitioners would receive from the carrybacks of NOLs.  At no time during 2002, 2003, and 2004 did Sioux Breeders or petitioners maintain facilities to board horses or hire staff to care for horses.  All horse boarding and care were provided by ClassicStar.

**[*8]**  Mr. Pederson paid ClassicStar $311,271 by personal check dated September 12, 2002, and $753,083 by personal check dated November 8, 2002.  Sioux Breeders borrowed $500,000 from Home Federal Bank in exchange for a promissory note dated November 29, 2002, and issued a check to ClassicStar for $492,001 on December 1, 2002.  Sioux Breeders also borrowed $1,556,355 from Keybank National Association (Key Bank)[3] in exchange for a promissory note dated December 12, 2002.  Sioux Breeders directed the disbursement of the Key Bank loan to ClassicStar and paid $1,000 in related legal fees associated with the loan, which was withdrawn from the amount of the loan, resulting in ClassicStar's receiving $1,555,355 from Key Bank.

Even though some horse pairings were listed at the time the letter of intent was signed, those pairings were subject to change.  Mr. Pederson entered into the transaction without knowing what horse pairs would ultimately be bred or if any horse pairing he received was worth the amount he was charged.  The horses were to be bred in the spring of 2003 and would foal in 2004 after an 11-month gestation period.  Petitioners received some updates regarding the pregnancies of the thoroughbred mares they leased.

---

[3]The extent of the relationship between ClassicStar and Key Bank is unclear. Mr. Pederson testified that Key Bank "had some familiarity" with ClassicStar.

**[*9]** The first breeding schedule was dated August 31, 2002, and included 11 pairings: Bet Twice Princess with Deputy Minister[4] for a total cost[5] of $311,341; Correoso with Mr. Greely for a total cost of $207,238; Gold Princess with Forestry for a total cost of $285,742; La Gueriere with Our Emblem for a total cost of $346,692; and 7 other pairings "To Be Named", each at a total cost of $346,692. Additional breeding schedules prepared over the next two years reflected a number of pairing changes, pairs being added or removed, price changes for the same pairings, and a trading of one already-bred mare for another.

The final breeding schedule, dated December 15, 2004, showed that Sioux Breeders eventually received three thoroughbred pairings and three quarter horse[6]

---

[4]Each horse pairing listed in this opinion will have the mare named first and the stallion named second.

[5]The total cost for a pairing included a fee to lease the mare, the breeding fee, additional mare expenses, prospective foal insurance (obtained after pregnancy of a mare, to pay in the case of a failed pregnancy or foal death after birth), estimated mortality insurance, and horse boarding expenses.

[6]The two breeds of horses petitioners dealt with were thoroughbreds and quarter horses. There were also unregistered horses of unknown breeds, as discussed supra. Certain rules apply to the breeding of the different breeds, possibly the most important of which is that artificial insemination of thoroughbreds is not permitted in the United States. Thoroughbred horses are generally worth more than quarter horses.

[*10] pairings. The thoroughbred pairings were: (1) Forest Key with Cozzene[7] for a total cost of $167,895; (2) La Gueriere with Gone West for a total cost of $399,625; and (3) Salty Perfume with Mr. Greeley for a total cost of $183,395. The quarter horse pairings were: (1) Tari Acre with CD Olena for a total cost of $786,932; (2) Three Wood DG with Dual Pep for a total cost of $786,932; and (3) To Dual For with Peptoboonsmal for a total cost of $786,931. Each pairing produced a foal. Petitioners visited the thoroughbred foals in 2004 and were involved in naming them.

Petitioners did not select the final pairings they received and appear to have had no input in the selection process. ClassicStar proposed all changes to the breeding schedules, and Mr. Pederson agreed to the changes "By leasing the mares" because he found the pairings "to be accurate, and * * * didn't find reasons to doubt [ClassicStar's] * * * suggestions." Mr. Pederson relied on Mr. Plummer's quarter horse suggestions because Mr. Plummer "knew much more than * * * [Mr. Pederson] could ever learn in a lifetime, and so * * * [Mr. Pederson] was counting on * * * [Mr. Plummer's] expertise as * * * [Mr.

---

[7]The foal of this pairing was traded for the foal of the pairing of Her Halo with Our Emblem before birth.

[*11] Pederson]  a manager in * * * [his] other businesses."  Mr. Pederson also believed that ClassicStar had his "interest at heart".

On July 25, 2003, Mr. Pederson, on behalf of Sioux Breeders, wrote to ClassicStar requesting 75.868% of his "Mare Lease Breeding and Racing Business [be converted] to working interest in natural gas wells being drilled by the Geostar Corporation" (Geostar).  Geostar was affiliated with ClassicStar; Geostar's vice president of operations, Tony Ferguson, had an ownership interest in ClassicStar at some point and promoted the Geostar exchange to petitioners.  Petitioners traded their interest in the three quarter horse pairings[8] (before birth of the foals) from the 2002 Program for $2,360,795 worth of Coalbed Methane Drilling Program shares with Geostar.  On January 20, 2004, Mr. Pederson was sent confirmation that the conversion was complete.

On June 26, 2005, Sioux Breeders and ClassicStar entered into an agreement whereby Sioux Breeders exchanged its three thoroughbred foals for $2,306,270-- comprising $750,915 in cash to be paid to Sioux Breeders on July 1, 2006, and a $1,555,355 "Payment to KeyBank * * * for retirement of debt and all interest due and payable from July 1, 2005."

---

[8]The total cost for the three quarter horse pairings ($2,360,795) was equal to 75.868% of the $3,111,710 Sioux Breeders spent on the 2002 program.

**[*12]** Petitioners received an income and expense summary for 2002 from ClassicStar which showed total expenses of $3,111,710, comprising board and mare care expenses of $165,000, breed fees of $651,900, mare lease fees of $1,888,896, and insurance expenses of $405,914. The income and expense summary listed no income. Petitioners listed these expenses and income on their 2002 Schedule F, Profit or Loss From Farming, as well as additional "other" expenses of $8,510, and claimed a resulting deduction of $3,120,220.

Petitioners kept a participation log for 2002 in which they recorded 172.25 hours of activity related to horse breeding. The hours were spread across activities such as reading horse magazines, books such as Seabiscuit and A Horse of a Different Color, setting up Sioux Breeders and performing other business planning and financial tasks (such as securing the loans from Home Federal Bank and Key Bank), reviewing documents, attending the Tattersail Sale,[9] dinners with Mr. Bangeter, participating in correspondence with various parties, and doing research on some of the horses potentially available for them to breed.

3. Petitioners' 2003 Participation in the ClassicStar Program

Petitioners chose to continue in the ClassicStar breeding program for a second year. On August 27, 2003, Mr. Pederson signed a letter of intent on behalf

---

[9]According to petitioners' notes, this is a horse auction.

[*13] of Sioux Breeders committing to spending $2 million on the ClassicStar breeding program in 2003 (2003 program). According to the letter of intent, the 2003 program was to be funded with four payments: (1) a downpayment of $50,000; (2) a September 1, 2003, payment of $140,000; (3) a November 15, 2003, payment of $810,000; and (4) a December 15, 2003, payment of $1 million. On December 15, 2003, Mr. Pederson (on behalf of Sioux Breeders) signed with ClassicStar a Mare Lease and Breeding Agreement, a Boarding Agreement, a Foal Agreement, and a Nominee Agreement for the 2003 program. As with the 2002 program, petitioners did not negotiate any of the specific fees, costs, or expenses related to their participation in the 2003 program, and the amount they committed to spend on the 2003 program was reached in part using an NOL calculator provided by ClassicStar.

On September 1, 2003, Mr. Pederson executed a check for $50,000 on behalf of Sioux Breeders which was delivered to ClassicStar. ClassicStar received another check for $150,000 from Sioux Breeders on October 9, 2003. Sioux Breeders borrowed $1 million from the National Equine Lending Co. (NELC) by promissory note dated November 1, 2003. Mr. Plummer's brother-in-law, Gary Thompson, was in charge of NELC. Mr. Pederson personally guaranteed the NELC loan, which was also secured by the prospective 2003 program foals. The

**[*14]** proceeds of this loan were distributed to ClassicStar according to a disbursement request filed with NELC by Sioux Breeders, and ClassicStar confirmed that it received the $1 million. Sioux Breeders also borrowed $800,000 from Home Federal Bank in exchange for a promissory note dated December 30, 2003. The proceeds of this loan were distributed to ClassicStar according to the promissory note.

In addition to these payments, on August 26, 2003, ClassicStar sent notice to Mr. Pederson that it had received a $497,060 check from Home Federal Bank on July 31, 2003, for payment toward the 2003 program.[10] Given the date these funds were purportedly received (before the 2003 program letter of intent was signed), the amount (not corresponding with any of the payments due according to the letter of intent), and the fact that $2 million was otherwise paid to ClassicStar for the 2003 program, we believe it likely that the notice was erroneous. Facts regarding what the alleged $497,060 may have been paid toward were not introduced.

---

[10]It is not clear whether these funds (if they were actually paid) were borrowed by Sioux Breeders from Home Federal Bank and distributed directly to ClassicStar or whether they were sent from a Sioux Breeders account with Home Federal Bank.

[*15] Just as with the 2002 program, the original 2003 program horse pairings were altered several times by ClassicStar and petitioners did not contest the changes made to the pairings. The final breeding schedule, dated December 20, 2004, showed that Sioux Breeders eventually received 3 thoroughbred pairings and 10 quarter horse[11] pairings. During gestation petitioners received some updates regarding the pregnancies of the thoroughbred mares they leased. The thoroughbred pairings were: (1) Above Perfection with Distorted Humor for a total cost of $251,110; (2) Golden Jenny with Carson City for a total cost of $82,915; and (3) Majestic Legend with Elusive Quality for a total cost of $170,200. The quarter horse pairings were:

| Mare | Stallion | Total cost |
|---|---|---|
| Brandy Loot | Buffalena | $166,750 |
| Clever Monique | Meradas Blue Sue | 462,925 |
| Harts Magic Popper | Mr. Jay Bar Cat | 195,500 |
| Madeline Amelia | Buffalena | 153,100 |
| MS Quick Star | Easter Caught a Cat | 86,250 |

---

[11]Respondent's expert witness claimed that six of the quarter horses in the 2003 program were actually unregistered horses of an unknown breed. He also claimed that two of the quarter horses in the 2004 program (discussed infra) were of an unknown breed. Petitioner's expert witness disputed these figures but conceded that at least one horse bred in the 2003 or 2004 Program was of an unknown breed.

| | | |
|---|---|---|
| **[*16]**NLD Two Eyed Missy | Easter Caught a Cat | 86,250 |
| Pennys Blue Bug | Easter Caught a Cat | 86,250 |
| Roco Banjo Blues | Easter Caught a Cat | 86,250 |
| Skip Dolly Bug | Easter Caught a Cat | 86,250 |
| Tippy Diamond | Easter Caught a Cat | 86,250 |

It was not established which pairings produced live foals.

At some point petitioners elected to exchange their thoroughbred foal interests from the 2003 program for a 2.01% interest in ClassicStar 2005 PowerFoal Stable, LLC (PowerFoal).[12]  Mr. Pederson described PowerFoal as a type of "mutual fund" for horses which could reduce an owner's risk by giving him a small portion of ownership in a larger number of foals, rather than just owning a few foals entirely.  Mr. Pederson believed that PowerFoal comprised "about 70 foals".

At some point petitioners elected to contribute their 2003 quarter horse foal interests to First Equine Energy Partners (FEEP), an affiliate of Geostar.[13]  At trial

---

[12]One sheet appears to list the date of the contribution as January 8, 2005, but the nature of the document makes it difficult to discern whether this was the actual date of contribution or some other date.

[13]As with the contribution to PowerFoal, it is difficult to discern the date of contribution, but one paper in evidence appears to state the date of contribution as February 15, 2004.

[*17] Mr. Pederson described FEEP as a natural gas exploration company similar to Geostar. However, on brief petitioners described FEEP as a "partnership that held quarter horse interests and gas wells, and which operated in a somewhat similar fashion to Powerfoal, in that it operated much like a mutual fund with respect to quarter horse interests." Mr. Pederson testified that he did not know what the horse aspect of FEEP was and that "They provided me an offer for my horses and I accepted that in exchange for the gas wells."

Petitioners received an income and expense summary for 2003 from ClassicStar which showed total expenses of $2 million, comprising board and mare care expenses of $180,000, breed fees of $201,000, mare lease fees of $1,358,000, and insurance expenses of $261,000. The income and expense summary listed no income. Petitioners listed these expenses and income on their 2003 Schedule F, as well as $362 of depreciation expenses, $90,447 in mortgage interest expenses,[14] and "other" expenses of $6,391. Petitioners claimed a resulting deduction of $2,097,200.

Petitioners kept a participation log for 2003 in which they recorded 169.75 hours of activity related to horse breeding. A total of 76 hours was attributable to

---

[14]The "mortgage interest expenses" were actually the total amounts of interest paid on the Key Bank and Home Federal Bank loans taken out to pay for the 2002 program. The payment of interest on loans is discussed further infra.

[*18] petitioners' visiting Kentucky for the Kentucky Derby and to inspect the ClassicStar facilities, as well as a second trip to Kentucky to view the Keeneland horse sale, tour those facilities, and learn about valuation of horses from the breeders at the sale. The remaining hours were spread across various research and correspondence activities.

4. Petitioners' 2004 Participation in the ClassicStar Program

Petitioners chose to continue in the ClassicStar breeding program for a third year. On September 24, 2004, Mr. Pederson signed a letter of understanding on behalf of Sioux Breeders committing to spending $1.8 million on the ClassicStar breeding program in 2004 (2004 program). According to the letter of understanding, the 2004 program was to be funded with three payments: (1) a downpayment of $180,000; (2) an October 15, 2004, payment of $720,000; and (3) a December 15, 2004, payment of $900,000. On December 23, 2004, Mr. Pederson (on behalf of Sioux Breeders) signed with ClassicStar a Mare Lease and Breeding Agreement, a Boarding Agreement, a Foal Agreement, and a Nominee Agreement for the 2004 program. On an unknown date Mr. Pederson also signed a Horse Board & Services Agreement with ClassicStar. As with the 2002 and 2003 programs, petitioners did not negotiate any of the specific fees, costs, or expenses related to their participation in the 2004 program. The amount

[*19] petitioners committed to spend on the 2004 program was determined after consulting with an accountant from Karren Hendrix regarding maximizing tax benefits (discussed further infra).

On September 27, 2004, Mr. Pederson executed a check for $18,000 on behalf of Sioux Breeders which was delivered to ClassicStar. ClassicStar received another check for $162,000 from Sioux Breeders on October 30, 2004. Sioux Breeders then borrowed $720,000 from NELC in exchange for a promissory note.[15] The proceeds of this loan were distributed to ClassicStar according to a disbursement request filed with NELC by Sioux Breeders. Sioux Breeders also borrowed a further $900,000 from NELC by promissory note dated (and signed) December 15, 2004. The proceeds of this loan were also distributed to ClassicStar according to the promissory note. Mr. Pederson personally guaranteed both NELC loans, which were also secured by the prospective 2004 program foals.

The original horse pairings for the 2004 program were altered only once by ClassicStar and petitioners did not contest the change. The final breeding schedule, dated December 21, 2004, shows that Sioux Breeders eventually

---

[15]Although the "Date of Note" is November 15, 2004, the note was not signed until December 15, 2004.

[*20] received two thoroughbred pairings and eight quarter horse[16] pairings. The thoroughbred pairings were: (1) Squall City with War Chant for a total cost of $203,600; and (2) Wild Heart Dancing with Pulpit for a total cost of $256,963. The quarter horse pairings were:

| Mare | Stallion | Total cost |
| --- | --- | --- |
| Austin Cat | Meradas Blue Sue | $251,000 |
| Bob and Sugar | Laredo Blue | 237,000 |
| Boonsmal Doll | Laredo Blue | 182,000 |
| CD Lissa | Pastels Smart Lena | 100,500 |
| Dainty as a Cat | Lots of Acres | 90,000 |
| SR Instant Jazz | TR Dual Rey | 204,743 |
| Twaynas Dreamer | Amando Pistolero | 135,000 |
| Yellow Rose Vandel | Amando Pistolero | 139,194 |

It was not established which pairings produced live foals, although it was established that two of the quarter horse pairings produced more than one foal and some of the quarter horse pairings did not produce a foal. In addition to the above listed costs, the final breeding schedule for 2004 listed "Estimated Future Cost[s]" totaling $402,000. These future costs comprised mortality insurance and boarding costs, presumably for the foals produced. It was unclear whether and how these estimated future costs were paid to ClassicStar.

---

[16]As discussed supra, one or two of the quarter horses in the 2004 program may have actually been unregistered horses of unknown breed.

**[*21]** At some point petitioners contributed their 2004 program quarter horse interests to FEEP in exchange for a greater ownership interest in FEEP. Petitioners kept their two thoroughbred foals from the 2004 program at the ClassicStar facilities until 2007, at which time they chose to move the horses to TaylorMade Farms in anticipation of selling the horses at auction. One of the horses sold at auction for approximately $35,000, and the other did not sell. The horse that did not sell was later exchanged with TaylorMade Farms for the board and sale fees on the other horse.

Petitioners received an income and expense summary for 2004 from ClassicStar which showed total expenses of $1,800,000, comprising board and mare care expenses of $150,000, breed fees of $177,200, and mare lease fees of $1,472,800. The income and expense summary listed no income. Petitioners listed no income on their 2004 Schedule F, and claimed only mare lease fee expenses of $1,472,800 listed on the ClassicStar summary. They claimed additional expenses on Schedule F totaling $151,915: $5,017 of "other" expenses; $4,900 of depreciation expenses; and $141,998 in "other" interest expenses. Petitioners claimed a resulting deduction of $1,624,715.

Petitioners were unable to find the participation log they completed for 2004. Certain documents were kept by ClassicStar which showed petitioners

[*22] participating in various horse related activities with ClassicStar personnel. The ClassicStar documents do not list the number of hours spent participating in these activities.

5. Further Financial Information

Many of the financial aspects of petitioners' loan repayments are opaque. The same is true of the investments in Geostar, FEEP, and PowerFoal. Few financial records pertaining to Sioux Breeders and other entities were introduced, and testimony on financial subjects suffered from a lack of specifics.

A. 2002 Program Financials

The $500,000 promissory note resulting from the loan from Home Federal Bank to Sioux Breeders for the 2002 program was repaid by petitioners in July 2003 with interest totaling $12,894.

Petitioners paid interest on the $1,556,355 Key Bank loan at least through October 2004 but stopped at some point. Mr. Pederson believed the debt had been paid by ClassicStar pursuant to its purchase of petitioners' 2002 program thoroughbred foals in 2005 because he "never received any further correspondence of debt being due from Key Bank". Petitioners never received the $750,915 in cash that ClassicStar had contracted to pay them for the 2002 program

[*23] thoroughbred foals.  ClassicStar later went bankrupt, and petitioners made a claim in the bankruptcy case for the money.  That case is still pending.

Sioux Breeders appears to have received cash distributions from Geostar at various times as a result of the gas interests held by Sioux Breeders.  However, certain cash distributions made to Sioux Breeders were reimbursed to Geostar out of an account formed to hold distributions to Sioux Breeders from FEEP (discussed further infra).  On March 28, 2008, Sioux Breeders exchanged its Geostar interest for 322,176 shares of Gastar Exploration Ltd., a stock publicly  traded on the Toronto stock exchange.  Mr. Pederson had an option to sell this stock at a specified price; but when he sought to exercise the option, there was a dispute about the price of the shares.  Sioux Breeders sold the shares and sued Geostar for the difference in price between what it received and what it was entitled to according to the options.  Sioux Breeders won a summary judgment in court and garnished the bank accounts of Geostar but was able to obtain only $99.  It appears that Geostar still owes Sioux Breeders over $1 million. Petitioners' 2008 tax return was not introduced into evidence, and the tax treatment reported for the 2008 Geostar exchange is unclear.

**[\*24]** B. 2003 Program Financials

Sioux Breeders paid $14,277 of interest on the $800,000 Home Federal Bank loan in 2004. During 2006 Sioux Breeders received a $251,808 distribution from PowerFoal which was used to pay down an unspecified Home Federal Bank loan. Further facts regarding payment of this Home Federal Bank loan were unclear or not available.

Sioux Breeders paid interest on the $1 million NELC loan through a reserve account which held gas distribution payments from FEEP. Excess amounts in the account were used to pay down the principal on the $720,000 NELC loan for the 2004 program (these payments are discussed further infra), as well as to pay certain amounts to ClassicStar and Geostar on behalf of Sioux Breeders.

At the end of 2004 the FEEP reserve account stopped paying interest on the $1 million NELC loan and interest began to accrue. At some point this loan went into default, and in October 2006 Sioux Breeders agreed to relinquish some of its FEEP interests to NELC in order to fully satisfy the $1,097,407 in principal and accrued interest outstanding.

C. 2004 Program Financials

A distribution from PowerFoal of $285,000 was used in 2005 to pay portions of the $720,000 and $900,000 NELC loans; $263,446 was paid toward

[*25] the $720,000 loan and $21,554 was paid toward the $900,000 loan. The amounts distributed by PowerFoal were paid directly to NELC.

It is unclear whether any other payments were made on the $900,000 NELC loan. As of January 2007 Sioux Breeders was in default on the $900,000 loan. At the time Sioux Breeders owed $945,600 in principal and interest on the loan. Sioux Breeders relinquished more of their FEEP interests to NELC during January 2007 in order to fully repay the loan.

An amortization schedule for the $720,000 NELC loan shows that all principal and interest was paid through a series of payments during 2005. One of these payments was the PowerFoal distribution of $263,446. As mentioned supra, a payment from a FEEP distribution reserve account was also made on the $720,000 loan during 2005. The amount of this reserve account payment was $146,754. One $4,218 payment is listed as a "Borrower Payment"; it is unclear whether Sioux Breeders actually made this payment. It is also unclear who made the remaining payments on the $720,000 NELC loan.

D. Other Financial Information

The $263,446 and $21,554 payments made by PowerFoal on the $720,000 and $900,000 NELC loans were included in petitioners' 2005 tax return as income on Schedule F. These amounts of income were offset by total interest expenses of

[*26] $194,173, insurance expenses of $43,989, depreciation of $2,950, and other

miscellaneous expenses of $1,918. Subtracting these expenses from the $285,000 in

income, petitioners reported net farm profit of $41,970 for 2005 on Schedule F.

Petitioners also reported $240,801 of royalty income (after expenses) on their 2005

tax return as a result of royalties from the Geostar Coalbed Methane Drilling

program shares they held at the time.

Petitioners' 2006 tax return reported a long-term capital gain of $1,095,556

resulting from the sale of interests in FEEP. Further details regarding the sale were

not established. The return also reported $309,629 of income on Schedule F,[17]

which was offset by $104,838 in expenses. Those expenses included $95,556 in

interest expenses. Subtracting expenses from the $309,629 in income, petitioners

reported on Schedule F net farm profit of $204,791 for 2006.

Petitioners' 2007 tax return reported long-term capital gains of $1 million

and $900,000. Under the "Description of property" heading, petitioners wrote

"NELC". Forms 1099-A, Acquisition or Abandonment of Secured Property, sent to

petitioners by NELC showed that the amounts were attributable to petitioners'

relinquishment of interests in FEEP in order to pay off NELC loans. Petitioners'

---

[17]This income appears to comprise the $251,808 PowerFoal distribution in 2006 (which was used to pay down an unspecified Home Federal Bank Loan) plus certain other amounts. What the other amounts are is not clear.

**[*27]** 2007 return reported no income but did report deductions of $87,920 for expenses on their Schedule F. These expenses comprised $1,775 in depreciation, $61,556 for "Veterinary, breeding, and medicine", and $24,589 in other expenses. No interest expenses were deducted on the Schedule F.

It was not clear how petitioners accounted for sale of their 2002 program thoroughbreds to ClassicStar for $750,915 and the payoff of the Key Bank loan. The sale was not reflected in any of petitioners' tax returns from 2002 to 2007, and tax returns for years after 2007 were not introduced.

6. Petitioners' Due Diligence

In addition to reviewing some of the tax materials provided by ClassicStar before entering the 2002 program and discussing ClassicStar with YPO members, Mr. Pederson had contact with a lawyer and certain accountants regarding the tax implications of petitioners' dealings with ClassicStar.

Mr. Pederson had an attorney, Doug Hayek, and an accountant, Jim Griebel, both of whom he had worked with for several years before 2002. Mr. Pederson provided both of them with the Handler Thayer tax opinion he had received from ClassicStar before entering the breeding program. However, Mr. Pederson did not provide them with the other materials he had received from ClassicStar before entering the breeding program. Mr. Hayek was not a tax specialist but a corporate

[*28] lawyer who had done some mergers and acquisitions work for Mr. Pederson. Mr. Pederson testified that Mr. Hayek told him that the tax opinion appeared in order. Mr. Griebel worked for PricewaterhouseCoopers LLP, and Mr. Pederson testified that Mr. Griebel told him the Handler Thayer tax opinion was correct. Mr. Griebel also discussed with Mr. Pederson several requirements petitioners needed to meet to deduct expenses associated with the horse breeding programs. Neither Mr. Hayek nor Mr. Griebel supplied petitioners with a written tax opinion regarding the tax treatment of their horse breeding programs, and neither testified at trial. Mr. Griebel prepared all of the relevant tax returns for petitioners.

Before entering the 2004 program, Mr. Pederson contacted Terry Green, an accountant working for Karren Hendrix, regarding the optimal amount to put into the 2004 program to maximize petitioners' tax benefits. Mr. Green had written the three Karren Hendrix opinion letters in the Due Diligence & Mare Lease Information Booklet petitioners received from ClassicStar before entering the 2002 program. Mr. Pederson knew Mr. Green had a relationship with ClassicStar.[18] After receiving an estimate of petitioners' 2004 income, Mr. Green recommended they spend $1,949,885 on the 2004 program to "offset * * * [their]

---

[18]Mr. Pederson testified that he believed Mr. Green "was of counsel to ClassicStar, may have been their CPA doing their tax return".

**[*29]** 2004 income and save about $383,000 of taxes for 2004, plus have a loss left over to carryback to 1999 and get a refund of about $296,800 of taxes paid for that year." Shortly after this communication Sioux Breeders agreed to spend $1.8 million on the 2004 program.

7. Expert Witnesses and Their Reports

Respondent submitted an expert report and petitioners submitted a rebuttal report prepared by their own expert. Respondent's expert was Richard Beck, and petitioners' expert was Michelle Stallings. Mr. Beck has extensive experience in equine consulting and breeding and has appraised horses for most of his career. Ms. Stallings has extensive experience in equine appraisals and other aspects of the equine industry. The parties agreed that both experts were qualified to testify in this case.

Mr. Beck's expert report concluded that petitioners did not participate in the horse breeding programs in a businesslike manner. Mr. Beck concluded that the amounts petitioners paid for quarter horse pairings were higher than the amounts required to buy (not lease) "very good Thoroughbred horses". Mr. Beck's report stated that the average auction price of a thoroughbred broodmare in 2003 was

[*30] $44,228 according to the Jockey Club[19] records and estimated that thoroughbreds were worth three times as much as quarter horses. Mr. Beck also criticized petitioners for a number of other aspects of the ClassicStar deals including: (1) allowing ClassicStar to make the decisions regarding which horse pairings petitioners would receive; (2) paying horse care fees which he determined to be at least 20% higher then the standard industry fees; and (3) buying prospective foal insurance for a large number of their pairings.[20] Mr. Beck stated that petitioners' chances of making a profit as a result of their horse breeding programs were exceedingly small. However, he did not appraise the individual horses bred for petitioners.

Ms. Stallings' rebuttal report concluded that petitioners' participation in the ClassicStar breeding program "had profit potential" and that petitioners participated in the horse breeding programs in a businesslike manner. As part of her analysis Ms. Stallings "researched the pedigrees, ownership, race, sale and production records of all the Thoroughbred mares" paired for petitioners, as well

---

[19]The Jockey Club maintains records for thoroughbred horses. Quarter horse records are maintained by the American Quarter Horse Association.

[20]Mr. Beck stated that most horse breeders do not use prospective foal insurance because of its high cost, opting instead for other forms of insurance such as live foal guaranties and full mortality insurance.

**[*31]** as all nonthoroughbred horses. However, only the thoroughbred analysis

was included in Ms. Stallings' report.[21] Even though appraisals for the

nonthoroughbred pairings were not included in her report, Ms. Stallings testified

---

[21]The relevant testimony from Ms. Stallings regarding the reason for not including the quarter horse analysis in the report was as follows:

A: I did the thoroughbreds because the contract said strictly for thoroughbreds, and I assumed that we were talking about, since the contract was strictly for thoroughbreds, I did only thoroughbreds.

Q: But you just testified you did an analysis of the entire contract?

A: To begin with, I didn't know where I was going with this, so I automatically did all the horses. I researched and reviewed all the information on the horses. When I got down to Classic Star contracts and it said strictly for thoroughbreds, then I focused in on the thoroughbreds.

Q: So --

A: But I'd already done the analysis on the others.

Q: But you didn't think it was important to put that analysis in your report?

A: Relevant to the assignment, as I believed the assignment was, was the thoroughbreds, I stuck with the thoroughbreds, because I thought that they should have been substituted with other thoroughbreds, and if they'd been substituted with just two or three thoroughbreds per package, there would have been a lot more profit.

Q: So is it fair to say that there's no analysis in your report about quarter horses, correct?

A: In -- yes, sir, there's not.

[*32] that she appraised these pairings before trial, which led her to testify that "over the three years, there could have been very easily a four percent profit" resulting from petitioners' thoroughbred and quarter horse breeding activities combined. Ms. Stallings concluded that all expenses petitioners paid were reasonable according to industry standards and that it was acceptable in a lease contract to be able to swap horses in and out upon the agreement of the parties.

Ms. Stallings' method of appraisal for each pairing (thoroughbred and nonthoroughbred) involved averaging the sale prices for the three most expensive yearlings sired by each stallion during the relevant year.[22] By appraising the pairings in this manner, Ms. Stallings did not consider the prices of other yearlings sired by the stallions and gave no consideration to the prices of yearlings born to the mares in the pairings at any time. Ms. Stallings testified that she believed appraising the pairings in such a manner was appropriate because of "ClassicStar's representation that they were going to provide the finest thoroughbred" mares to petitioners for breeding and that "The clients' expectation * * * was that they would get the upper end of the horses in the sale results, or they wouldn't have spent all this money."

---

[22]For example, Ms. Stallings took the top three sale prices of yearlings sired by Our Emblem (a 2002 program stallion bred for petitioners in 2003) from breeding in 2003.

**[\*33]** 8.  Other Information

Petitioners continued to be involved in horse breeding activities after their relationship with ClassicStar had ended and after they sold the two 2004 program thoroughbreds in 2007.  At some point they leased a mare from Gulf Coast Farms, contributed the foal to a "PowerFoal-like" entity, and also bought into a stallion syndicate.  Their involvement in horse breeding activities has continued to the present.

Petitioners carried back NOLs from 2002, 2003, and 2004 to 1997, 1998, 1999, and 2000.  On February 10, 2009, respondent issued a notice of deficiency to petitioners for 1997, 1998, 1999, 2000, 2002, 2003, and 2004 resulting from the disallowance of all Schedule F expenses they claimed for 2002, 2003, and 2004, disallowance of related NOLs, and certain computational adjustments.  Petitioners timely filed a petition contesting the deficiencies and penalties.

OPINION

I.  Burden of Proof

Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner are incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Deductions are a matter of legislative grace, and taxpayers bear the burden of proving that they have met all

**[\*34]** requirements necessary to be entitled to the claimed deductions.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

The parties have raised a number of arguments regarding the deductibility of expenses associated with petitioners' horse breeding activities.[23]  The parties agree that petitioners do not bear the burden of proof with regard to every issue. However, because we decide the breeding expenses issue on the basis of the preponderance of the evidence, we need not discuss which party has the burden of proof for each issue.  See Knudsen v. Commissioner, 131 T.C. 185 (2008).  The burden of proof regarding the accuracy-related penalties is discussed infra.

## II.  Bifurcation of the Horse Breeding Activities

At trial the Court raised the possibility that petitioners' horse breeding activities might be bifurcated into thoroughbred breeding and quarter horse breeding activities.  This might have benefited petitioners by separating the thoroughbred pairs, which may have had profit potential, from the quarter horse pairs, which, barring extraordinary circumstances, did not have profit potential. We have previously considered bifurcation of horse breeding activities before considering whether the requisite section 183 profit objective existed.  See Scheidt

---

[23]Most of these arguments are not addressed in this opinion because we find in respondent's favor based on sec. 183.

[*35] v. Commissioner, T.C. Memo. 1992-9, 1992 Tax Ct. Memo LEXIS 15 (refusing to bifurcate a taxpayer's horse breeding activity when taxpayer held a 20% interest in a farm which owned 28 of 36 syndicate shares of a breeding stallion and petitioner directly owned 1 of the syndicate shares).

Petitioners have not argued that their horse breeding activity should be bifurcated for purposes of section 183.[24]  However, we will address the issue.  We find that the horse breeding activity at issue may not be bifurcated.

When considering whether an activity may be bifurcated for purposes of section 183, we look to the degree to which elements of the activity are intertwined.  See Scheidt v. Commissioner, 1992 Tax Ct. Memo LEXIS 15, at *16-*17.  In this case the elements of petitioners' horse breeding activity were significantly intertwined; there was one mare lease agreement in each year between the same parties which listed both thoroughbred and quarter horse pairs, and petitioners paid the total contract cost as one expense (rather than making separate payments for each listed pair).  Considering the facts of this case, we find

---

[24]Rather, petitioners have argued that for purposes of sec. 162, if we "determine that certain costs for petitioners' breeding pairings are excessive, * * * [we] may simply disallow the portion * * * [we] determine[s] exceeds a reasonable amount."  Petitioners further claim that we "need not bifurcate the contract to allow the portion of the expenses claimed related to the thoroughbreds" only.

**[\*36]** that petitioners' breeding of horses was a single, integrated activity which may not be bifurcated for purposes of section 183.

III.  Section 183 For-Profit Requirement

Section 183(a) provides in part that "In the case of an activity engaged in by an individual * * * if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section."  Section 183(c) provides that "For purposes of this section, the term 'activity not engaged in for profit' means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."  Deductions are allowable under section 162 for expenses of carrying on activities that constitute a trade or business and under section 212 for expenses incurred in connection with activities engaged in for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income.  Deductions are not allowable under section 162 or 212 for the expenses of an activity that is not engaged in for profit.

An activity is engaged in for profit if the taxpayer entertained an actual and honest profit objective in engaging in the activity.  Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without opinion, 702 F.2d 1205 (D.C. Cir. 1983); sec.

**[\*37]** 1.183-2(a), Income Tax Regs. The taxpayer's expectation of profit must be in good faith. Allen v. Commissioner, 72 T.C. 28, 33 (1979) (citing section 1.183-2(a), Income Tax Regs.). Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. Greater weight is given to objective facts than to a taxpayer's mere statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), aff'd, 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor controls. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981).

[*38] Considering these factors, we find that petitioners' horse breeding activities were not engaged in for profit.

A.  Manner in Which the Taxpayer Carries On the Activity

The fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit.  Sec. 1.183-2(b)(1), Income Tax Regs.  Petitioners argue that this factor favors them because they conducted due diligence of the breeding programs, approached them as they did Mr. Pederson's other businesses, maintained extensive records, made adjustments to the programs, and "abandoned the activity * * * when it was clear that it would not be profitable due to the problems with ClassicStar."  We disagree.

Few financial records were introduced pertaining to Sioux Breeders or petitioners relating to their participation in the breeding programs.  Those that were introduced either tended to be general records (such as petitioners' tax returns) or were prepared by ClassicStar or related entities (such as the contracts, breeding schedules, and FEEP/Geostar/PowerFoal documents).  No detailed records or expense reports of Sioux Breeders were introduced; the income and expense summaries which were introduced were completed by ClassicStar and sent to Sioux Breeders.

**[*39]** It is true that Mr. Pederson investigated the ClassicStar breeding programs before entering. He questioned other YPO members about ClassicStar, took a trip to the ClassicStar facilities, reviewed the documents sent to him by ClassicStar, and took one of the tax opinion letters provided to him by ClassicStar to both his lawyer and his accountant. However, upon entering the programs petitioners began to rely entirely on ClassicStar, allowing ClassicStar to make all alterations to their breeding schedules. While Mr. Pederson claims to have reviewed the changes, he never vetoed a change made by ClassicStar and had very little knowledge about horses. In addition, he testified that he trusted the judgment of ClassicStar employees and believed they had his best interest at heart. Petitioners claim such reliance was similar to how Mr. Pederson's other businesses operated; Mr. Pederson often relied on the knowledge of others to make his businesses successful. However, it appears that in his other businesses Mr. Pederson was relying on the expertise of a party that was working for his company, rather than the expertise of an outside entity such as ClassicStar. Sioux Breeders did not hire, and petitioners did not seek outside advice regarding the horses which ClassicStar assigned to them.

We also note that although the information presented to petitioners regarding the breeding programs discussed only thoroughbred horses and the first

[*40] breeding schedule listed only thoroughbred horse pairings, petitioners did not object when ClassicStar filled out large portions of the breeding schedules with quarter horses.[25] Of 29 pairings, 21 pairings were either quarter horse pairings or horses of unknown breed paired with quarter horses. Although quarter horses are worth significantly less than thoroughbreds, many of the quarter horse pairings petitioners received cost as much as or more than thoroughbred pairings (especially in 2002).[26] While Mr. Pederson testified that he relied on and trusted ClassicStar's suggestions, we believe that his failure to raise the issue of the quarter horse pairings is strong evidence that petitioners did not carry on the breeding activity in a businesslike manner.

Petitioners claim to have made adjustments to the activity and "abandoned the activity * * * when it was clear that it would not be profitable due to the problems with ClassicStar". What adjustments were made was not specified; the breeding activities for each of the three years do not appear significantly different

---

[25]The fact that petitioners were given a large number of quarter horse pairings even seems to have confused petitioners' expert witness; Ms. Stallings testified that her report evaluated only the "thoroughbreds because the contract said strictly for thoroughbreds".

[26]Some vague testimony was given regarding possible embryo transfers from quarter horse pairings to produce extra foals, but it was not shown that any embryo transfers actually took place.

**[\*41]** to us. In each of the three years nearly three-fourths of the allocated funds were designated to quarter horses rather than thoroughbreds, in each year petitioners traded in horses for an interest in an entity with a relationship to ClassicStar, and petitioners removed only two horses from ClassicStar's care (the 2004 program thoroughbreds). Even though they abandoned the breeding activity after the 2004 program, we believe it more likely that petitioners ceased their breeding activities with ClassicStar because of the increasingly unstable nature of ClassicStar's scheme rather than any concern about profit.[27]

We find this factor favors respondent.

B. Expertise of the Taxpayers or Their Advisers

Preparation for an activity by extensive study of its accepted business and economic practices or consultation with those who are expert therein, may indicate that a taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Sec. 1.183-2(b)(2), Income Tax Regs. As discussed supra pp. 38-39, petitioners were not experts in horses or horse breeding and did not hire any of their own experts with respect to their horse breeding activities. While petitioners did educate themselves to some extent regarding the

---

[27]We note that ClassicStar entered bankruptcy soon after petitioners ceased their horse breeding activities.

[*42] horse industry (reading horse magazines and general books about the industry such as Seabiscuit, as well as attending horse sales), such education amounted to only a few dozen hours per year and also involved an element of enjoyment.  We do not believe that such education adequately prepared petitioners to knowledgeably evaluate horse breeding contracts and pairings.

Although petitioners claim to have relied on the advice of ClassicStar, ClassicStar was not an expert they hired.  Rather, it was a for-profit company with which petitioners (through Sioux Breeders) had entered into business.  We do not believe reliance on such advice was reasonable.

Both petitioners' and respondent's experts testified to the effect that the horse industry is a difficult industry and that it takes years of experience to succeed without expert advice.  In spite of the difficulty of the business, petitioners entered into millions of dollars in breeding contracts relying only on a nominal amount of education and the advice of a for-profit company which was the other party to the contracts.

We find this factor favors respondent.

C.  <u>Time and Effort Expended by the Taxpayer in Carrying On the Activity</u>

The fact that the taxpayer devotes much of his personal time and effort in carrying on an activity may indicate an objective to derive a profit, particularly if

**[*43]** the activity does not have substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs. Petitioners introduced records indicating that they spent approximately 170 hours with respect to their horse breeding activities in both 2002 and 2003. Mr. Pederson also testified that they spent "maybe a couple hundred" hours above those reflected on the 2002 and 2003 records. He further testified that petitioners had lost their 2004 records but spent a similar amount of hours on breeding activities in 2004. ClassicStar's records somewhat supported Mr. Pederson's testimony regarding the 2004 hours.

There is a recreational aspect to horse breeding, and some of the hours petitioners spent regarding the activity were recreational (such as reading Seabiscuit and A Horse of a Different Color, as well as attending horse sales and dinners with ClassicStar personnel). However, most of the hours were spent on aspects of the activity pertaining more to the business side of the activity (such as reviewing documents, setting up companies, and discussing various financial aspects of the activity).

Considering the number and quality of hours petitioners spent related to their breeding activities, we find this factor is neutral.

**[*44]** D. <u>Expectation That Assets Used in the Activity May Appreciate in Value</u>

A taxpayer may intend, despite a loss from current operations, that an overall profit will result when appreciation in the value of assets used in the activity is realized. Sec. 1.183-2(b)(4), Income Tax Regs. "There is an overall profit if net earnings and appreciation are sufficient to recoup losses sustained in prior years." <u>Filios v. Commissioner</u>, T.C. Memo. 1999-92, slip op. at 17 (citing <u>Bessenyey v. Commissioner</u>, 45 T.C. 261, 274 (1965), <u>aff'd</u>, 379 F.2d 252 (2d Cir. 1967)), <u>aff'd</u>, 224 F.3d 16 (lst Cir. 2000). Petitioners claim that they intended and expected their foals to appreciate so that they would realize an overall profit as a result of their horse breeding activities. We disagree.

Petitioners traded in most of their foals (before or after birth) for interests in various entities associated with ClassicStar or, as with the 2002 program thoroughbreds, sold horses to ClassicStar directly. However, the amounts petitioners traded their horses for were merely plugged-in numbers or otherwise not indicative of an actual profit resulting from the trade-in or sale. For example, petitioners traded in their three 2002 program quarter horse foal interests for $2,360,975 worth of Coalbed Methane Drilling program shares with Geostar. The $2,360,975 was merely a plugged-in number equal to the exact amount of expenses Sioux Breeders incurred as a result of the three quarter horse pairings in

**\*45]** the 2002 program. When petitioners eventually tried to convert their Geostar interest to cash in 2008, Geostar failed to pay the agreed upon amount, indicating that the drilling program shares were not actually worth $2,360,975.

Another example is the sale of the 2002 program thoroughbreds, which petitioners sold in exchange for $750,915 in cash to be paid to Sioux Breeders on July 1, 2006, and a $1,555,355 "Payment to KeyBank * * * for retirement of debt and all interest due and payable from July 1, 2005." Sioux Breeders never received the cash payment. While the loan appears to have been paid off, circumstances surrounding the loan payoff are suspicious. While no direct link between ClassicStar and Key Bank was established, Mr. Pederson testified that Key Bank "had some familiarity" with ClassicStar. In addition, Mr. Pederson never received confirmation the loan was paid; he believed the debt had been paid because he "never received any further correspondence of debt being due from Key Bank." In addition, petitioners failed to report the payoff on any of their 2002 through 2007 tax returns.

Further examples are the FEEP and PowerFoal interests petitioners received for their 2003 and 2004 program quarter horse foal interests and their 2003 program thoroughbred foal interests, respectively. The FEEP interests paid several distributions to petitioners which were held in a special reserve account

[*46] and used to pay interest on NELC loans and certain amounts to ClassicStar and Geostar on behalf of Sioux Breeders. One PowerFoal distribution was used to pay down an unspecified Home Federal Bank loan, and one distribution was used to pay down two NELC loans. The FEEP interests were eventually forfeited to satisfy NELC loans; it is unclear what became of the PowerFoal interests.

It is apparent that the relationships among ClassicStar, FEEP, PowerFoal, Gastar, and NELC[28] were part of a scheme designed for participants in the ClassicStar program to repay certain loans without ever making a cash expenditure. We do not put any stock in the fact that petitioners were able to "sell" or "trade in" many of their foal interests to such entities for an apparent profit (in the case of the 2002 program thoroughbreds sold to ClassicStar) or stated interest in an entity.

If we disregard the "trade-ins" and "sales" of most of their thoroughbred foal interests and all of their quarter horse foal interests, it is apparent that the odds petitioners' foal interests could have appreciated enough to result in an overall profit were exceedingly small.[29] Although Ms. Stallings testified that even

---

[28]As previously discussed, Key Bank may have also been a part of the scheme.

[29]As Mr. Beck acknowledged in his testimony, "Anything is possible" when it comes to potential profit from breeding thoroughbreds as one exceptional foal can sell for or win millions of dollars.

[*47] considering both the quarter horse and thoroughbred pairings "there could have been very easily a four percent profit," we are inclined to side with Mr. Beck's opinion that petitioners' chances of making a profit as a result of their horse breeding activities were very small.

We have two significant concerns with the appraisal conducted by Ms. Stallings. First, her report did not include appraisals for the quarter horse pairings petitioners received, only the thoroughbred pairings. Although Ms. Stallings testified that a 4% profit was still possible even including the quarter horse pairings, the basis for this conclusion was not laid out in her report. The reason for not including the quarter horse pairings is somewhat unclear, but it seems Ms. Stallings was confused by ClassicStar's representations to petitioners that only thoroughbreds would be bred. Ms. Stalling might have also been reluctant to include the quarter horse appraisals because it seems petitioners' quarter horse pairings as a whole had a negative profit potential, even using Ms. Stallings' flawed appraisal methodology (discussed further infra).

**[\*48]** Our second issue with Ms. Stalling's report involves her appraisal methodology. In valuing the foal interests resulting from each pairing[30] she averaged the sale prices for the three most expensive yearlings sired by each stallion in the relevant year but did not consider the prices of the less expensive yearlings sired by the stallions and gave no consideration to the prices of yearlings born to the mares. Ms. Stallings testified that she believed this methodology was appropriate based on "ClassicStar's representation that they were going to provide the finest thoroughbred" mares to petitioners for breeding and that "The clients' expectation * * * was that they would get the upper end of the horses in the sale results, or they wouldn't have spent all this money."

The fatal flaw in Ms. Stallings' appraisals is her reliance on representations made by ClassicStar. She should have realized that ClassicStar's representations did not carry a great deal of weight, given ClassicStar's extensive provision of quarter horse pairings despite representations that they would provide only thoroughbred pairings. Given her heavy reliance on the representations made by ClassicStar, without relying on actual mare foal sales in support, we do not find Ms. Stallings' report to be credible.

---

[30]The same methodology was used for both the thoroughbred and quarter horse interests, although Ms. Stallings included only the thoroughbred interests in her report.

**[*49]** While there are several flaws with Mr. Beck's report, chief among them lack of any appraisal of petitioners' pairings, we agree with his conclusion (if not the method by which he reached it). Two primary facts support this conclusion: (1) the fact that many of petitioners' quarter horse pairings cost considerably more than their thoroughbred pairings, especially in the 2002 program; and (2) the low sale/exchange prices for petitioners' two 2004 program thoroughbreds (one selling for only $35,000, the other not selling and being exchanged for sale and board fees).[31] It is evident that petitioners significantly overpaid for the pairings they received to such a degree that their chances of making a profit were negligibly low.

Considering the facts previously discussed, we find that petitioners did not have a good-faith belief that their horse breeding activities would turn an overall profit. We find this factor favors respondent.

---

[31]We realize that the sale/exchange of only 2 horses is likely not significant in comparison with the 29 total pairings petitioners received, and that there is a certain amount of luck involved in horse breeding. However, after disregarding sales/exchanges involving ClassicStar or related companies, these two sales/exchanges are the only hard data regarding sales of petitioners' foals we have available.

**[*50]** E.  Success of the Taxpayer in Carrying On Other Similar or Dissimilar Activities

The fact that a taxpayer has engaged in similar or dissimilar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable.  Sec. 1.183-2(b)(5), Income Tax Regs.  Mr. Pederson has started multiple successful businesses, both in fields he was and was not familiar with.  He does not have day-to-day involvement with many of these businesses.  However, in his other businesses Mr. Pederson relied on either his expertise or the expertise of someone working for him, as opposed to petitioners' reliance on the other party to the contract in the ClassicStar deal.  We do not believe Mr. Pederson's past business activitiess are sufficiently similar in operation to petitioners' horse breeding activities for this factor  to favor petitioners.  Accordingly, we find this factor is neutral.

F.  Taxpayer's History of Income or Losses With Respect to the Activity

Where losses continue to be sustained beyond the period which customarily is necessary to bring an operation to profitable status, such continued losses, if not explainable as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit.  Sec. 1.183-2(b)(6), Income Tax

[*51] Regs. Little information in the expert reports pertained to the time which it customarily takes to bring a horse breeding operation to profitability, but "[w]e have said that the startup phase of a horse-breeding activity may be 5 to 10 years". Davis v. Commissioner, T.C. Memo. 2000-101, slip op. at 25 (citing Engdahl v. Commissioner, 72 T.C. 659, 669 (1979), Burrow v. Commissioner, T.C. Memo. 1990-621, and Starr v. Commissioner, T.C. Memo. 1969-35). Petitioners had three years of significant losses with respect their horse breeding activity but did claim certain income in later years, mostly resulting from surrendering their FEEP interests to pay off NELC loans. Considering the facts, we find this factor is neutral.

G. Amount of Occasional Profits

The amount of any occasional profits the taxpayer earned from the activity may show that the taxpayer had a profit motive. See sec. 1.183-2(b)(7), Income Tax Regs. An occasional small profit from an activity generating large losses or from an activity in which the taxpayer has made a large investment would not generally be determinative that the activity is engaged in for profit. Id. In addition, "A small chance to make a large profit may indicate that a taxpayer has a profit objective even if he or she has large continuous losses." Lundquist v. Commissioner, T.C. Memo. 1999-83, slip op. at 27 (citing section 1.183-2(b)(7),

**[*52]** Income Tax Regs.), aff'd without published opinion, 211 F.3d 600 (11th Cir. 2000).

Although petitioners did report significant amounts of income after 2004 in connection with their horse breeding activities, this income was not enough to offset the losses incurred through their participation in the activity.  In addition,  most of this income resulted from petitioners' surrendering their FEEP interests to pay off NELC loans or distributions from FEEP, Gastar, or PowerFoal.  We believe such income should be disregarded for purposes of this factor, as petitioners were engaged in a circular financial game with ClassicStar and related entities through which they received certain assets for their foal interests which did not reflect the true value of those foal interests.  Only a very small amount of reported income was due to the sale/exchange of petitioners' foals involving third parties.

We find this factor favors respondent.

H.  Financial Status of the Taxpayer

The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs.  Substantial income from sources other than the activity (particularly if the losses from the activity generate

[*53] substantial tax benefits) may indicate that the activity is not engaged in for profit. Id. We have recognized that "As long as tax rates are less than 100 percent, there is no 'benefit' in losing money." Engdahl v. Commissioner, 72 T.C. at 670.

The losses sustained by petitioners did provide them with significant tax benefits. Not only were petitioners able to offset their income from those years with the losses; petitioners also carried back losses to 1997, 1998, 1999, and 2000. In addition, many of the losses petitioners claimed were not actual economic losses. Approximately 40% of the claimed losses were financed through loans from NELC and were forgiven when petitioners surrendered FEEP interests to NELC. Petitioners reported income from these forfeitures at favorable capital gains rates years after using the losses to offset reported income, much of which was taxed at higher rates. Through sales and exchanges with ClassicStar and related entities, petitioners were able to offset more of their breeding losses years after those losses were reported. Furthermore, a large part of the promotional materials ClassicStar sent to petitioners focused on purported tax benefits; these large tax benefits further offset any expenses petitioners actually incurred.

We recognize that tax planning is often a consideration when deciding whether to enter a business. However, this case does not represent a normal

**[*54]** instance of tax planning. Rather, we believe petitioners' participation in the ClassicStar breeding program was almost entirely motivated by tax benefits purportedly available to them through such participation.

We find this factor favors respondent.

### I. Elements of Personal Pleasure or Recreation

The presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. Sec. 1.183-2(b)(9), Income Tax Regs. Although horse breeding may involve elements of enjoyment and Mrs. Pederson testified that some aspects of their participation in the breeding activity were "fun", we do not believe that petitioners were significantly motivated by the recreational elements. Petitioners did not have a great deal of contact with their foals and delegated essentially all the breeding work to ClassicStar. Petitioners were also not heavily involved in the sale/exchange of their foals; they sold/exchanged most of their interests through seemingly prearranged deals with entities related to ClassicStar and a third party (TaylorMade Farms) who was involved in the sale/exchange of the only two other horses.

We find this factor favors petitioners.

**[\*55]** J.  Other Relevant Facts

Petitioners point out that they continued to be involved in horse breeding activities after their relationship with ClassicStar had ended and after they sold the two 2004 program thoroughbreds in 2007.  At some point they leased a mare from Gulf Coast Farms, contributed the foal to a "PowerFoal-like" entity, and bought into a stallion syndicate.  Their involvement in horse breeding activities has continued to the present.

While no facts regarding the profitability of these additional horse breeding activities were introduced, we find petitioners' continued involvement in horse breeding activities supports their position.

K.  Section 183 For-Profit Requirement Conclusion

Considering the factors discussed above, we find that petitioners' horse breeding activities were not engaged in for profit, and the related expenses are therefore not deductible under section 162 or 212 for any of the years at issue. Respondent's determination of deficiencies based on that determination is sustained.

IV.  Accuracy-Related Penalties

Respondent determined that petitioners are liable for 20% accuracy-related penalties under section 6662(a) and (b)(1) for negligence or disregard of rules and

**[\*56]** regulations, or in the alternative, under section 6662(a) and (b)(2) for substantial understatements of income tax.[32]  Respondent determined that these penalties should apply for 1997, 1998, 1999, 2000, 2002, 2003, and 2004. Petitioners contest the imposition of accuracy-related penalties.

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  However, once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalties are inappropriate because of reasonable cause or substantial authority under section 6664.  See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447.  Respondent has shown that petitioners improperly deducted expenses and NOL carrybacks associated with their participation in the ClassicStar breeding program.  Considering this showing in conjunction with other facts discussed infra, we find that respondent has met his burden of production.

---

[32]Because we find that petitioners substantially understated their income tax, we need not address whether petitioners acted negligently or in disregard of rules and regulations.

[*57]  An individual substantially understates his or her income tax when the reported tax is understated by the greater of 10% of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  Income tax is not understated to the extent that the treatment of the item is (1) based on substantial authority, or (2) relevant facts are adequately disclosed in the return or in a statement attached to the return and there is a reasonable basis for the tax treatment of the item by the taxpayer.  Sec. 6662(d)(2)(B).

Certain special rules regarding substantial understatement of income tax apply in the case of NOL carrybacks.  Section 1.6662-4(c)(1), Income Tax Regs., provides that--

> The penalty for a substantial understatement of income tax applies to any portion of an underpayment for a year to which a loss, deduction or credit is carried that is attributable to a "tainted item" for the year in which the carryback or carryover of the loss, deduction or credit arises (the "loss or credit year").  The determination of whether an understatement is substantial for a carryback or carryover year is made with respect to the return of the carryback or carryover year.  "Tainted items" are taken into account with items arising in a carryback or carryover year to determine whether the understatement is substantial for that year.

Section 1.6662-4(c)(3)(i), Income Tax Regs., provides that "a 'tainted item' is any item for which there is neither substantial authority nor adequate disclosure with respect to the loss or credit year."

**[\*58]** Petitioners do not dispute that their taxes for the relevant years were understated by the greater of 10% of the tax required to be shown on each return or $5,000 as the result of deductions claimed for horse breeding expenses. However, petitioners argue that they had substantial authority and a reasonable basis for the tax treatment of the expense deductions, and therefore no understatement of income tax. See sec. 6662(d)(2)(B). We disagree.

There is substantial authority for the tax treatment of an item only if the weight of all relevant authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. Sec. 1.6662-4(d)(3)(i), Income Tax Regs. The substantial authority standard is an objective standard less stringent than the more-likely-than-not standard. Sec. 1.6662-4(d)(2), Income Tax Regs. Reasonable basis is a relatively high standard of tax reporting that is significantly higher than not frivolous or not patently improper, but less stringent than the substantial authority standard. Secs. 1.6662-3(b)(3), 1.6662-4(d)(2), Income Tax Regs. "The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim." Sec. 1.6662-3(b)(3), Income Tax Regs.

In order to determine whether petitioners had substantial authority or a reasonable basis for the tax treatment of items related to their horse breeding

[*59] activities, we reviewed a multitude of relevant authorities cited in this opinion and in the parties' briefs. This Court has previously decided a number of cases regarding the breeding of horses on the basis of section 183. The outcome of each case is fact specific; some of these cases have allowed deductions for associated decisions, while others have denied deductions. See, e.g., Engdahl v. Commissioner, 72 T.C. 659 (allowing deduction); Davis v. Commissioner, T.C. Memo. 2000-101 (allowing deduction); Sanders v. Commissioner, T.C. Memo. 1999-208 (denying deduction); Filios v. Commissioner, T.C. Memo. 1999-92 (denying deduction); Lundquist v. Commissioner, T.C. Memo. 1999-83 (denying deduction). Considering the facts of this case, we believe it is clear that petitioners did not have an actual and honest profit objective in engaging in the horse breeding activities and therefore failed to satisfy the section 183 for-profit requirement. As a result, we find that petitioners did not have substantial authority or a reasonable basis for the tax treatment of items related to their horse breeding activities and that no reduction in the understatement of income tax should result. See sec. 6662(d)(2)(B).

Petitioners also argue that accuracy-related penalties do not apply because petitioners meet the reasonable cause defense of section 6664(c)(1). Pursuant to that section, accuracy-related penalties under section 6662 do not apply to any

[*60] portion of an underpayment for which a taxpayer establishes that he or she: (1) had reasonable cause, and (2) acted in good faith. Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item. See United States v. Boyle, 469 U.S. 241 (1985); Estate of Young v. Commissioner, 110 T.C. 297, 317 (1998). Good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. See Boyle, 469 U.S. 241; sec. 1.6664-4(b), Income Tax Regs. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners claim the reasonable cause and good faith exception applies because they: (1) carefully reviewed the Handler Thayer and Karren Hendrix tax opinions sent to them by ClassicStar; (2) provided Mr. Griebel, their accountant, and Mr. Hayek, their lawyer, with the Handler Thayer tax opinion, which was received positively; (3) had Mr. Griebel prepare their tax returns; and (4) "investigated the * * * business and ClassicStar with their YPO contacts and reasonably relied on them based upon the trust they placed in members of that organization." We disagree.

[*61] We have previously held that--

> for a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove * * * that the taxpayer meets each requirement of the following three-prong test:  (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.

Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).  In addition, reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about.  Id. at 98.

We first dismiss petitioners reliance upon any materials provided to them by ClassicStar.  First, the booklet containing the Handler Thayer and Karren Hendrix tax opinions encourages each "participant to involve his/her accountant fully" and states that ClassicStar "shall not act as a tax advisor".  This should have signaled to petitioners that reliance upon those letters would not be reasonable.  In addition, Mr. Pederson testified that he knew Mr. Green, the accountant who had written the three Karren Hendrix tax opinion letters for ClassicStar, had a relationship with

[*62] ClassicStar. Considering these facts, we find reliance on these materials was not reasonable.

We next address petitioners' claimed reliance on other YPO members. Not only was there no evidence presented that any YPO members were competent professionals with experience sufficient to justify reliance; it seems that many of the YPO members petitioners spoke with about ClassicStar were engaged in horse breeding activities with ClassicStar or were part of ClassicStar's operations (in the case of Mr. Plummer and Mr. Bangeter). As a result, we find petitioners failed to prove their reliance on YPO members was reasonable.

We finally address facts relating to Mr. Hayek and Mr. Griebel. Mr. Hayek was shown only the Handler Thayer tax opinion (not other information provided to petitioners by ClassicStar), was not a tax specialist (although he was a corporate lawyer), and did not testify at trial regarding his expertise in the area of tax or information provided to him by petitioners. Considering these facts, we find that petitioners failed to prove Mr. Hayek was a competent professional who had sufficient tax expertise to justify reliance or that petitioners provided him with all necessary information regarding ClassicStar.

Similar to Mr. Hayek, Mr. Griebel was shown only the Handler Thayer tax opinion (not other information provided to petitioners by ClassicStar) and did not

[*63] testify at trial. Mr. Pederson testified that he supplied Mr. Griebel with relevant documents to complete petitioners' tax returns and also answered certain "clarifying questions" regarding the information Mr. Pederson provided. When specifically asked whether he advised Mr. Griebel of the conversion of petitioners' 2002 program quarter horse foals into gas well interests with Geostar, Mr. Pederson testified that he "believe[d]" he did.

We find that Mr. Pederson's testimony is insufficient to prove that petitioners provided all necessary and accurate information to Mr. Griebel. This is especially true in the light of the fact that Mr. Pederson admitted that he did not provide Mr. Griebel with certain ClassicStar materials, even though these materials encouraged each "participant to involve his/her accountant fully". In addition, we have previously found a failure to prove reasonable reliance when taxpayers do not call their tax advisers to testify and rely only on their own self-serving testimony.[33] See Heller v. Commissioner, T.C. Memo. 2008-232, aff'd, 403 Fed. Appx. 152 (9th Cir. 2010); see also Swanson v. Commissioner, T.C. Memo. 2009-31. Considering the only evidence presented is Mr. Pederson's self-serving testimony that he supplied Mr. Griebel with all necessary and accurate

---

[33]Petitioners' counsel stated at trial that petitioners would not be calling Mr. Griebel because "[h]e was not released by his firm to testify." No further explanation was provided.

**[\*64]** information, we do not believe petitioners have satisfied the three-pronged test of <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, to prove their reliance on any advice given to them by Mr. Griebel was reasonable.

We conclude that petitioners substantially understated their income tax for each year in issue. We also conclude that petitioners are not entitled to the reasonable cause and good-faith exception because they did not prove that they reasonably relied on tax professionals. We therefore hold that petitioners are liable for the 20% accuracy-related penalty under section 6662 for each year in issue.

## V. Conclusion

We find petitioners are not entitled to deductions for horse breeding expenses incurred through their participation in the ClassicStar breeding program. We also find petitioners are liable for accuracy-related penalties under section 6662 for each of the years 1997, 1998, 1999, 2000, 2002, 2003, and 2004.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

**[*65]** To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.